CENTRAL BUILDING & CLEANING COMPANY, INC., Plaintiff-Appellant, *v.* THOMAS H. VODNANSKY, Defendant-Appellee.—(LOUIS KRAML, Indiv. and d/b/a Kraml's Continental Tuckpointing Building & Maintenance Company, Defendant.)

First District (4th Division)   No. 79-1433

Opinion filed May 8, 1980.

Berger, Newmark & Fenchel, of Chicago (Earl B. Lichten, of counsel), for appellant.

Frankenstein & Frankenstein, of Chicago (Robert R. Frankenstein, of counsel), for appellee.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, Central Building & Cleaning Company, Inc. (Central), appeals from an order of the circuit court of Cook County which denied its petition for a preliminary injunction against the defendant, Thomas H. Vodnansky. The other defendant, Louis Kraml, was dismissed as a party during the proceeding below. The purpose of the injunction sought by

Central was to enforce a covenant not to compete and to protect its trade secrets. On appeal Central argues (1) the trial court's finding that Central's employment agreement with Vodnansky was unreasonable and unenforceable, was manifest error and an abuse of discretion and (2) the trial court's order granting Vodnansky's motion for denial of a preliminary injunction was an abuse of discretion.

At the hearing below Central called three witnesses: Louis Kraml, Vodnansky, and Charles Rivkin, the president of Central. At the close of the plaintiff's case, Vodnansky moved for denial of the preliminary injunction under section 64(3) of the Civil Practice Act. (Ill. Rev. Stat. 1977, ch. 110, par. 64(3).) This motion was granted and Central's petition for a preliminary injunction was denied.

Central has been in the business of tuckpointing, weatherproofing and restoring buildings for 55 years. Its customers are primarily in Cook County, Illinois, but it has some accounts in Lake County, Indiana, and Du Page, Will and Lake Counties, Illinois. Central has several hundred competitors in the five county area. It has no exclusive customers.

On March 1, 1974, after two meetings with Central's president, Rivkin, Vodnansky accepted a job with Central. Vodnansky began working with Central on March 12, 1974. On that date, Rivkin asked Vodnansky to sign an employment contract. Vodnansky agreed to do so. This contract contained the following provision:

> "In consideration of the employment by the Employer, Employee agrees that on the termination of his employment for any cause whatsoever he will not directly or indirectly, as an employee of another, or in business for himself, engage in the business of building cleaning, tuckpointing, maintenance or in any competitive business within Cook, Lake, Du Page and Will Counties, Illinois, and Lake County, Indiana, for a period of three (3) years from the date of the termination of such employment; Employee further agrees upon termination, as aforesaid, not to solicit any of the Employer's customers at any time after such termination, or to ever divulge or disclose any information relating to Employer's business, or any knowledge or secrets that he had or might, from time to time, have acquired pertaining to the business of the Employer."

There is conflicting testimony as to whether Vodnansky was told prior to March 12 that Central would require him to sign a covenant not to compete.

Vodnansky worked for Central until April 12, 1978. During his four-year employment there he estimated jobs, purchased materials and equipment, met with customers, supervised jobs and crews, and was privy to the formulas for various mixes and solutions for use on the jobs.

On April 12, 1978, Vodnansky left Central. He purchased a company known as Kraml's Continental Tuckpointing Building and Maintenance Company (Kraml), a competitor of Central. After purchasing Kraml, Vodnansky performed work for three companies which Central alleges were its customers. Two of these jobs were done for the Whiston group. The Whiston group had never been a customer of Central but one of its employees had previously worked for one of Central's customers. The third job was done for a company for which Central had previously done work.

The decision to grant or deny a preliminary injunction rests in the sound discretion of the trial judge and appellate review is restricted to a determination of whether the trial judge correctly exercised his broad discretionary powers. *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 390 N.E.2d 68; *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 345 N.E.2d 795.

This appeal is from the denial of a preliminary injunction. The substantive issues of this cause have not yet been determined. We will therefore address the substantive issues only so far as is necessary to determine whether the court abused its broad discretion in denying the preliminary injunction.

■■ For a preliminary injunction to issue, the movant must establish (1) possession of a right which needs protection; (2) immediate and irreparable injury if the injunction is denied; (3) no adequate remedy at law; and (4) probability of success on the merits. (*Image.*) Here, such a showing is dependent upon the enforceability of the restrictive covenant.

■ A basic reasonableness test is employed to determine the enforceability of a covenant not to compete. (*Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686, 329 N.E.2d 414.) These covenants are enforced only if (1) a trade secret or confidential information is involved; (2) the time limits and geographic scope are reasonable; and (3) the restrictions imposed are reasonably necessary for the protection of a legitimate business interest. (*Image.*) Because Central was required to show a likelihood of success on all three of these issues, the failure to do so as to any one of them would require a denial of the preliminary injunction.

The trial court found that Central was not likely to succeed in showing that a trade secret or confidential information is involved. Central argues that its method of estimating is a trade secret and that this method and its methods of supervising jobs, servicing customers, and purchasing supplies and its formulas for various mixes and solutions are confidential information.

Rivkin testified that Central's method of estimating is a trade secret and is confidential information. He stated that the usual practice in the industry is to estimate using the "unit measurement" technique. Under

this method the estimator multiplies the average price per square or lineal foot by the number of feet involved in a job.

Central's method is to estimate the time it will take to do a job, figure the labor costs for the time involved, and add in the cost of materials. Estimators are provided with a list of "variables" which might affect the amount of time a job will require. These variables include the type and amount of architectural detail, the type of brick or other material, and possible hinderances such as power lines.

The variables and other written guidelines serve as a starting point in training an estimator to determine how long a job will take. They help an estimator form a "mental picture" of the work being performed. More important than the listed variables and written guidelines are the personal training by Rivkin and the estimator's on-the-job experience through which the estimator learns to determine which variables are important under what circumstances and to analyze the effect the variables will have on the time a given job will require.

As part of the training process, Rivkin and an estimator inspect buildings together. The estimator completes an estimate and Rivkin then analyzes that estimate step by step, questioning the estimator and pointing out where the estimator's analysis differs from Rivkin's. As the result of estimating several hundred jobs with Rivkin, and after gaining experience on actual jobs, an estimator will, over a period of years, learn to conceptualize and analyze a job the way Rivkin does.

Rivkin testified that Central's method of servicing customers was confidential information. Central's personnel are trained to answer customer inquiries honestly. One person is responsible for an entire project through its completion. "Salesmanship" is the key to service in the industry but Central relies upon "service" instead.

Rivkin testified that Central had a "secret methodology" for purchasing materials and equipment. Vodnansky was given a listing of about 100 suppliers which Central, over a period of 40 to 50 years, had determined would provide reliable service, quality goods and low prices. Rivkin believed that some of these suppliers gave special price considerations to Central. Part of Vodnansky's job was to find suppliers who would provide service and goods of quality similar to those on Central's list but at better prices. Central's suppliers were listed in the telephone book and they sold to the general public. Vodnansky returned the supplier list to Central before he left the company.

Rivkin testified that Central had a unique method of job supervision. Each supervisor had the specifications for every job and was able to supervise not only the work assigned to him but also those jobs assigned to others.

Rivkin testified that Vodnansky and other management level

personnel were given formulas for acid solutions, epoxies, mortar and cement. The foremen or laborers actually made the different mixes, but only the supervisors were allowed to determine what formula would be used.

Vodnansky was called as an adverse witness. He testified that much of the alleged confidential information such as the identity of Central's suppliers and its formulas was known to the workers. He denied that he had been informed that any of the information was confidential.

■■ We conclude that the trial court's denial of preliminary injunctive relief was not an abuse of discretion. It was not against the manifest weight of the evidence to determine that Central was unlikely to succeed in showing that its formulas, method of supervising jobs, and method of servicing customers were unique, original or confidential or that its sources of equipment and supplies were confidential. Neither was it against the manifest weight of the evidence to conclude that Central's method of estimating was not a trade secret or confidential information and to conclude instead that Vodnansky learned to estimate through his day-to-day experience and training on the job. We express no opinion as to whether a trade secret or confidential information is involved. These are substantive issues which are yet to be determined.

In our view, it is inappropriate at this stage of the proceedings to alter the court's determination that trade secrets and confidential information are not involved. When the proceedings on the permanent injunction begin, Central will have the opportunity to demonstrate that its various methodologies and formulas are trade secrets or confidential information. At the same time Vodnansky will be able to offer evidence countering these claims. These matters and other issues pertaining to the enforceability of the covenant not to compete and the protectability of the alleged trade secrets will be determined on their merits following the proceedings on the permanent injunction. See *Affiliated Hospital Products, Inc. v. Baldwin* (1979), 79 Ill. App. 3d 74, 398 N.E.2d 290.

For the reasons set forth above the order of the circuit court is affirmed.

Affirmed.

JOHNSON and ROMITI, JJ., concur.