MALLAVAROPU S. RAO, M.D., Plaintiff-Appellant, v. ST. ELIZABETH'S HOSPITAL OF THE HOSPITAL SISTERS OF THE THIRD ORDER OF ST. FRANCIS, Defendant-Appellee

Fifth District   No. 5—84—0585

Opinion filed January 24, 1986.

Jeffrey R. Glass, of Wagner, Bertrand, Bauman & Schmieder, of Belleville, for appellant.

Michael J. Nester and Clark D. Smith, both of Donovan, Hatch & Constance, P.C., of Belleville, for appellee.

JUSTICE JONES delivered the opinion of the court:

The plaintiff, Mallavaropu S. Rao, M.D., brought suit against the defendant, St. Elizabeth's Hospital of the Hospital Sisters of the Third Order of St. Francis, seeking a temporary restraining order, preliminary injunction, and permanent injunction following the defendant's permanent suspension of the plaintiff from its medical staff. The plaintiff sought to enjoin the defendant's suspension of his privileges. The trial court issued a temporary restraining order but after a hearing denied the petition for preliminary injunction. Thereafter the trial court denied the plaintiff's motion to reconsider its order denying the preliminary injunction and still later granted the defendant's motion to dismiss the plaintiff's amended complaint for permanent injunction, for declaratory judgment, and for other relief. The plaintiff has appealed presenting several issues for review.

The facts are largely undisputed. On March 12, 1984, David Rose, M.D., chairman of the defendant's department of medicine and of the executive committee of the defendant's department of medicine, wrote a letter to the plaintiff stating that the executive committee of the department of medicine wished to inform him that as of that date he would not be allowed to admit any new patients to the defendant institution or to see any new consultations there and that once any patients he was seeing at the time were discharged, all medical privileges would be suspended. Further, all interpretations privileges in the heart station would cease according to the same schedule. The letter stated that the executive committee had reached this conclusion because of

> "the following findings. After careful review of multiple patient records the following has been determined.
>
> 1. The number of glucose tolerance tests ordered is excessive and in many cases there is no appropriate indication for a glucose tolerance test;
>
> 2. There is serious question of the validity of interpretation of echo cardiograms.

3. The number and appropriateness of the diagnoses of angina pectoris, diabetes mellitus, and hypertension is not substantiated by the patients' records.

4. The number and appropriateness of multiple studies ordered from the Heart Station for each patient appears to be in error."

The letter advised the plaintiff that if he so requested, "pursuant to Article VII, Section 2, Subsection 2 of the Medical Staff Bylaws, you will have the opportunity to have an interview before an Ad Hoc Committee of the Medical Staff of St. Elizabeth's Hospital for review of your suspension." On March 15, 1984, at a special meeting the executive committee of the medical staff supported unanimously the summary suspension made by Dr. Rose.

On April 4, 1984, the ad hoc committee of the defendant's medical staff conducted a hearing in response to the plaintiff's request for one. A transcript of this hearing, which was entered into evidence at the hearing with regard to the preliminary injunction, is included in the record for review. The plaintiff was not represented by counsel at the hearing conducted by the ad hoc committee. Dr. Rose was not present at the hearing. In his absence the ad hoc committee entered his letter to the plaintiff of March 12, 1984, into the minutes. Early in the proceedings the plaintiff read a statement from a letter to the chief of defendant's medical staff, Dr. Santiago, in which the plaintiff said, *inter alia*, " 'I regret commissions and omissions inadvertently carried out by me during stressful situations during this [apparently the past few months] while caring for my patients at St. Elizabeth's Hospital. I was rightfully disciplined by my peers of the Medical Staff. This happened in the past and I assure you this will never be repeated.' " He concluded the statement by saying, " 'I only ask that I will be allowed to clear my name by being given another chance. Thank you for anything you might do in my behalf.' " Dr. Cagas, the chairman of the ad hoc committee, asked the plaintiff, "If this were a court of law and you would, you had been asked specifically, granting for the sake of argument that these are individually related charges, how would you—what's the word—plead to this charge? Are you innocent or guilty of any of these four?" The plaintiff responded, "As I mentioned earlier, charts and all, I might have in somebody elses' view maybe not an appropriate diagnosis. In other words, I might have erred in so many charts, under the situations. In other words, I'm not totally denying Dr. Rose's statement." Prior to the hearing, the committee had reviewed 57 charts. The plaintiff stated at the hearing that he had not gone through "all the charts." Dr. Cagas

asked the plaintiff if he would like to be given more time to review the charts in question. The plaintiff answered that he would like that opportunity. Considerable discussion by the committee members and the plaintiff ensued about reconvening the meeting at another time some days later, for example, so that the plaintiff could have an opportunity to review the charts in question. At one point in the discussion the plaintiff stated, "and if I'm at your disposition, give me time to go through the charts. I'll answer your questions, whatever you suggest to me. I'm at your disposition. I'm here at your disposition." One of the five members of the committee suggested that the plaintiff review the charts during the meeting already in progress. When asked whether he could review the charts at the meeting already convened, the plaintiff answered, "If you have time. I don't want to hold you all up. If you have time, I will be able to. If not, give me time. I will go through. Like I said, this is up to your disposition of you members." Thereafter the following discussion was had:

"DR. CAGAS: The question, gentlemen, is shall we show the charts now and discuss those charts or shall we give him a chance to review and meet another time? Let us resolve that.

DR. ZENAROSA: What do you think, Dr. Rao?

DR. RAO: I'm at your disposition.

DR. CAGAS: He's leaving it to the committee. I need a motion from the committee.

DR. SOUTHWORTH: I move we discuss the notes tonight.

DR. SAKRAN: I favor.

DR. CAGAS: Those in favor?

(At this time, the motion was carried by a unanimous showing of hands.)"

The hearing thereupon continued with a discussion of the plaintiff's ordering of glucose tolerance tests. When asked whether the substance and the essence of items Nos. 3 and 4 of Dr. Rose's letter, concerning the diagnosis of angina pectoris, diabetes mellitus, and hypertension and the number of studies ordered from the heart station, were correct or incorrect, the plaintiff responded, "Substance is correct, yes." Of the 10 patients whose charts were mentioned during the hearing, about five were discussed at some length. In three of these five instances the plaintiff agreed that the criticisms advanced by the members of the committee were valid and that he had been in error. During the hearing one member of the committee asked the plaintiff, "And then you also said that your practice from here on will be different from what it has been. How different would it be, in what respects?" The plaintiff answered in part, "Accepted normal criteria,

from the standard, it would not be—glucose tolerance test, you wouldn't see in every patient, and you wouldn't see the echocardiogram on most patients or EKGs. Any hospital has some standards. So the testing will be minimal. *** History will be more thorough. And final summary will be more thorough. And anything that is unnecessary, tests will not be seen on the chart." At the conclusion of the hearing a member of the committee asked the plaintiff, "[D]o you feel that there is anything that the committee should do that we haven't done to shed more light on the subject, to gather more facts?" Do you feel that there's anything we should do that we haven't done?" The plaintiff responded:

"You have done the best way of asking me questions. All of you. I'm not trying to praise you all here. But—past two nights I couldn't sleep for what questions you're going to ask me. You asked me appropriately, and no intimidation from any angle, and made me comfortable, able to come here. No matter what you make a decision, but you have done very good questioning and make me feel comfortable. If you have anything from me, I'm open, anytime available, anyone of you call me."

On April 11, 1984, the ad hoc committee submitted its report concerning the plaintiff's suspension to Dr. Santiago. The ad hoc committee confirmed the allegations made in Dr. Rose's letter of March 12, 1984, and reported as a further finding,

"In addition, it [the committee] discovered a pattern of over and/or inappropriate utilization of laboratory procedures, particularly EKGs and glucose tolerance tests and examples of complaints of illnesses that were not substantially confirmed by subsequent hospital course, and instances of final diagnosis that did not jibe with or were not substantiated by history or laboratory data including serious additions (examples: diverticulitis, spastic colitis, thyrotoxicosis) and omissions (example: cholelithiasis). In the interpretations of glucose tolerance tests, he appeared to ignore existing guidelines."

The ad hoc committee made the following four recommendations:

"1. Dr. Rao be asked to take a leave of absence for one year;

2. After that time when he comes back to the Medical Staff, he should not be given privileges to read EKG's, echocardiogram and Holter monitor tests, invasive cardiac or endoscopic procedures;

3. He should be appropriately proctored for one year; and

4. If Dr. Rao does not accept the first three recommendations, the alternative recommendation would be suspension."

On May 7, 1984, the executive committee held a special meeting to hear the report of the ad hoc committee. At the special meeting the executive committee accepted the report of the ad hoc committee but did not accept its recommendations and, instead, voted to suspend the plaintiff permanently from the defendant's medical staff. The plaintiff was notified that the executive committee had voted to recommend the plaintiff's suspension from the medical staff to the defendant's board of directors. On May 11, 1984, the plaintiff requested an appellate review, pursuant to the bylaws, of his suspension. The appellate review committee met on June 7, 1984, affirmed the executive committee's recommendation of permanent suspension, and made a recommendation of permanent suspension of the plaintiff to the defendant's board of directors. On June 12, 1984, the defendant's board of directors notified the plaintiff of its decision, effective immediately, to suspend him permanently from the defendant's medical staff.

On June 19, 1984, the plaintiff brought suit, as we have said, for a temporary restraining order, a temporary injunction, and a permanent injunction, alleging the violation by defendant of his procedural and substantive due process rights and the violation by defendant of its own bylaws in the plaintiff's suspension. That same day the trial court granted a temporary restraining order enjoining the defendant from suspending the privileges of the plaintiff. That order was later extended until the hearing for preliminary injunction on July 2, 1984. On June 29, 1984, the defendant moved to dissolve "all injunctions" issued in the cause, asserting, *inter alia*, that the defendant's bylaws were followed with respect to the plaintiff's suspension.

At the hearing on the preliminary injunction the plaintiff was the only witness. He testified that he is on the staffs of Memorial Hospital in Belleville and of Centreville Township Hospital, that he has been on the staff of the defendant institution for 11 years, and that the defendant hospital is the primary one he uses in his practice. He stated that the morning after he received the letter of March 12, 1984, from Dr. Rose he requested a meeting with Dr. Rose asking for an "explanation, the details of the charges. What patients are you talking about and what did I do wrong. What specifics. He refused to meet with me." Thereafter, he said, he wrote a letter to the executive committee of the staff asking for a hearing pursuant to the bylaws. On March 15, 1984, he met with the executive committee for about 20 minutes. The result of that meeting was his continued suspension. The plaintiff then requested in writing a hearing before the ad hoc committee. When he received notice of that hearing, the notice made no reference to any specific charts or specific patients or to any "representative" charts to

be discussed at the hearing to be held on April 4, 1984. Prior to the hearing, he said, he had no idea which of his patients would be discussed. He stated that no one from the executive committee was at the meeting of the ad hoc committee to present evidence against him or to be cross-examined by him. At the meeting of the ad hoc committee the members had "charts and some members even had some journal articles and prepared questions in front of them." He stated that he was unable to respond appropriately to specific questions that were asked of him by members of the ad hoc committee concerning specific charts

"[b]ecause I did not have at once [sic] notice of what charts they were going to ask about and they already have prepared material in front of them, prepared questions in front of them. On the spot I had some knowledge regarding these patients not in the charts, in the office files which would have supplemented had I had time to get the information from the office files supplement why a particular test was ordered, what was result of particular test and family history and other elements, the findings were in the office files. I did not have them and I was under a lot of pressure. Nervous in front of members. Never been before. Make me unable to answer questions as good as I could have."

He stated further, "I have lot of information in the office files. I could have gotten, obtained the information from them and answered some of the reasons why I ordered certain tests, why the diagnosis was like that." He said that this information was available to him, which he could have brought to the hearing had he known which patients were to be discussed. He testified that approximately eight or nine of the 57 charts were discussed. At the conclusion of this hearing, he said, he did not feel that he had been able to prepare and defend himself properly. Asked why he felt that way, he answered, "Because I respond to the charge of the questions from the committee who had already prepared and had no preparation, no prior knowledge."

On cross-examination the plaintiff testified that orally, prior to the ad hoc committee hearing, he had informed Dr. Harsin, the defendant's medical director, that he did not understand the nature of the charges against him. In the letter notifying plaintiff of the ad hoc committee's hearing on April 4, 1984, Gerald Harman, defendant's executive vice president, had advised him to contact Dr. Harsin if plaintiff had any questions or needed additional information. During cross-examination, the following questions were asked and answers given:

"Q. Isn't it true, sir, that on a number of occasions during the course of the Ad Hoc hearing that was conducted on April 4,

1984 the doctors that were present and comprised the committee indicated to you that either, one, a recess could be taken so that you could review patients' charts or, two, the committee could be adjourned and reconvened at a later date to give you an opportunity to review the patients' charts and your notes at the office? Isn't that correct?

A. Yes, sir.

Q. And that happened on a number of occasions during the course of the hearing. Correct?

A. Yes, sir.

Q. Isn't it true, sir, that you told the committee that you would leave the decision up to them as to whether or not they wanted to go forth that night or whether they should postpone and reconvene? Correct?

A. Yes, sir.

Q. In fact at one point during the committee hearing a vote was taken by the committee as to whether or not you should be allowed to review patients' charts that evening rather than close the session and reconvene at a later time. Correct?

A. Yes, sir.

Q. And the vote was taken that the hearing should proceed and that you should be allowed to review the patients' charts that evening. Is that correct?

A. Could you repeat your question, please?

Q. And a vote was taken by the Committee that you should be allowed to review the patients' charts there that evening as the committee met?

A. Yes, sir, but 57 charts or so. One of the physicians mentioned they would like to get it done tonight no matter how late it takes.

Q. Didn't you acquiesce in that decision? Did they give you an opportunity—

MR. GLASS [counsel for plaintiff]: I am going to object to the form of the question as far as acquiesce.

THE COURT: I will overrule the objection.

Q. Didn't you acquiesce in that decision? They asked you whether or not you wanted to stop proceedings, ask for a delay, so that you could prepare and reconvene at a later time. They specifically asked for that, sir?

A. Yes, sir.

Q. That was done a number of times during the meeting. Correct?

A. Not number of times, sir.

Q. Two or three times it was suggested.

A. Not many times.

Q. You said, 'I will do whatever the committee wants to do.' Correct?

A. I didn't want to make the committee mad.

Q. My question is you decided to do or go along with whatever the committee decided to do?

A. Yes, sir, because they had more knowledge of the cases. If they thought that charges were slight [sic], they could give me time. If they thought the charges were minor I thought they would because they already had a prior knowledge. I felt it was safe to give them the opportunity to decide whether I need more time.

Q. You agreed to that? Correct?

A. I agreed to that not knowing.

Q. But you agreed to that, did you not, sir?

A. Yes, sir.

Q. You acquiesced in that decision. Correct?

A. Yes, sir.

Q. And therefore the Committee proceeded that evening and allowed you to review the charts that evening rather than at a later time. Correct?

A. Yes, sir.

Q. And you did in fact review several charts during the course of that meeting. Correct?

A. Not several, sir. Maybe six or seven maybe."

The plaintiff stated further on cross-examination that the contents of Dr. Rose's letter of March 12, 1984, were discussed during the course of the hearing of the ad hoc committee on April 4, 1984, and that he "had to" admit to the committee that the charges listed as Nos. 3 and 4 in the letter were correct. He said that he had admitted that those two allegations were correct "for lack of adequate preparation." Asked, "You didn't tell the committee at that time that you were saying that they were correct simply because you hadn't had a chance to review the allegations, did you?" the plaintiff answered, "It was a different state of mind, sir, at ten o'clock at night. I had no choice to say yes."

On redirect examination the plaintiff testified that at the hearing of the ad hoc committee 57 charts of specific patients were there to be discussed, that he had first learned that when he arrived at the hearing that evening, and that any admission he had made concerning er-

rors or commissions had been made generally and not with respect to any of the 57 patients whose charts were at the hearing. Asked why he had made the statement concerning his "commission and omissions," the plaintiff responded:

"Sir, I was embarrassed. I wanted to—first of all, I was nervous and shaky in front of these five people who are going to determine my future. My livelihood. Decide my future. So, I thought admitting some of the minor errors and commissions and omissions on the general basis, I thought I would get some sort of reprieve. I went there for guidance. I thought they would guide my mistakes and omissions and commissions being first time ever being brought before a committee like that. I was so inexperienced in that field was being in fact I was not sure what I was saying. I said sorry, sir. I admitted to please the committee members."

Concerning his willingness to let the ad hoc committee determine whether the hearing should be continued to a later date, the plaintiff answered:

"When they asked me so many times I had a feeling that most members are anxious to get the meeting done over with that night. In fact one member said, 'If it takes all night I want to finish this off. I do not have time to come back next time.' I did not know the depth of the charges. I thought minor charges. So, I felt if they were only superficial charges I thought we could finish that night. They were depth, I would have had more time and I did not know the depth of charges and the extent of the charges. So, I left it to the committee and the mercy of the committee members."

On July 2, 1984, following the hearing, the trial court entered an order dissolving the temporary restraining order and denying the petition for preliminary injunction. In its order the court stated: "After considerable discussion regarding whether Dr. Rao should be granted additional time for preparation it was decided that 'no such extension was necessary. Dr. Rao acquiesced in this decision, and consequently the hearing proceeded." The court stated further:

"The record of the Ad Hoc proceedings are [sic] a part of this record and indicate [sic] that the hospital by-laws were not followed to the letter. The hearing was informal, the members of the committee were reluctant participants.

Nevertheless, this Court finds that Dr. Rao was afforded all the administrative review provided for in the by-laws. Although the Ad Hoc hearing was informal, there was nothing to indicate

any prejudice towards Dr. Rao. To the contrary it was evident that it was an uncomfortable situation for all concerned. Dr. Rao simply could not rebut the charges although he was given ample opportunity to do so.

After viewing the evidence and considering the testimony of Dr. Rao, this Court finds that the proceeding was not unfair or prejudicial to Dr. Rao."

On July 5, 1984, the plaintiff moved for and was allowed leave to amend his petition for temporary restraining order. On that day the plaintiff filed an amended petition for a temporary restraining order, declaratory judgment, permanent injunction, and other relief. Plaintiff sought to have the court declare the actions of the defendant in suspending him a nullity. On the same day the plaintiff filed a motion for reconsideration by the court of its order of July 2, 1984. The gist of the motion for reconsideration was that plaintiff had not concluded its arguments in response to the defendant's motion to dissolve the temporary restraining order and that the court, by ruling on the motion to dissolve, had denied the plaintiff the opportunity to present fully to the court its position in support of preliminary injunction. The motion also addressed the court's failure to state in what respect the defendant's bylaws were not followed, as the court had said, "to the letter." On July 13, 1984, the defendant filed a motion to dismiss the plaintiff's amended petition for temporary restraining order, declaratory judgment, and permanent injunction, asserting that the pleading is barred by, *inter alia*, the court's order of July 2, 1984, and the doctrine of *res judicata.*

Following a hearing on July 17, 1984, the court entered an order on August 13, 1984, denying the plaintiff's motion to reconsider. The court stated, *inter alia*, in its order of August 13, 1984:

"After considerable discussion regarding whether Dr. Rao should be granted additional time for preparation it was decided that no such extension was necessary. The plaintiff was asked a number of times if he desired a few days to prepare. Each time he said he was at their disposition and would leave it up to the Committee. Essentially, Dr. Rao acquiesced in the decision of the Ad Hoc Committee to let the hearing proceed without further delay."

The court continued by saying:

"It is a well-settled rule that a private hospital has the right to suspend a physician from its medical staff, and such suspension is not subject to judicial review. However, a private hospital must follow its By-Laws in taking such action.

It is the contention of the plaintiff, that the provisions of the By-Laws were not adhered to in the instant action. Plaintiff maintains that there was insufficient notice and the committee was forced to act as both judge and jury. Consequently, Dr. Rao asserts that he was denied a fair and impartial hearing to which he was entitled.

The Court rejects the aforementioned contentions of the plaintiff. Admittedly, the Ad Hoc Committee hearing was informal, and the By-Laws may not have been strictly adhered to. Nevertheless, a review of the record of the Ad Hoc Committee does not indicate in any way that Dr. Rao was not given a proper hearing. It is the opinion of this Court that the plaintiff was afforded all the administrative review provided for in the By-Laws. The committee gave Dr. Rao ample opportunity to rebut the charges against him. The record contains numerous requests by committee members to the plaintiff to offer anything at all in his defense. He simply could not do so, but merely requested another chance. It is apparent that the Ad Hoc Committee bore no prejudice towards Dr. Rao. The committee's reluctance to reprimand the plaintiff is evident throughout the record."

The court concluded, after considering the authorities and arguments of counsel as well as reviewing the record once again, that the order of July 2, 1984, was proper. The court stated that there was no just reason to delay execution or appeal.

After a hearing on August 22, 1984, the court on August 28, 1984, "affirmed" its orders of July 2, 1984, and August 13, 1984, and granted the defendant's motion to dismiss, stating again that there was no just reason to delay execution or appeal. At the hearing, the defendant argued that the plaintiff's amended petition for permanent injunction should be denied on the basis of *res judicata* because of the court's disposition earlier of plaintiff's petition for temporary injunction. The defendant took the position that in seeking the permanent injunction the plaintiff sought relief identical to that sought in the temporary restraining order and in the preliminary injunction and that "inasmuch as the Court has made findings of fact and conclusions of law and that the parties are identical and the issues are identical, St. Elizabeth's Hospital would submit that the plaintiff's complaint for permanent injunction is barred." The defendant maintained that the doctrine of *res judicata* applied because the court had made a determination on the merits of the case. The plaintiff agreed that "the Court has made a decision somewhat on the merits of the case and yet there has been no hearing on the merits" and asked the court to reconsider

its order of August 13, 1984, and to "rule strictly on the procedural matters at this stage." The plaintiff sought "a change in the wording and phraseology so it doesn't preclude Dr. Rao from having his hearing on the merits because that is all we are asking for." The plaintiff stated that at the hearing for a permanent injunction he intended to call "many more witnesses," having put on at the hearing for preliminary injunction only enough evidence, in his opinion, to show the likelihood of success on the merits and not all of the evidence he would introduce at a hearing on the merits for permanent injunction. Following the arguments of counsel on this matter, the trial court commented:

> "That is the sole crux and the only issue in this case. bylaws, did he get a full and fair hearing according to the bylaws and then even if there was some error, not prejudicial error, but did he in effect give up all those rights? He was asked numerous times *** and did he knowingly, willingly give up those rights? I mean that is why I made the order the way I did. I think before anything else you have to get over that hump first."

On September 5, 1984, the plaintiff moved that the court reconsider its orders of August 13 and August 28, 1984. Following a hearing on September 11, 1984, the court denied the motion in an order filed September 11, 1984.

The plaintiff has appealed, presenting for review five issues, which we quote:

> "1. Whether a court may make a final ruling on the merits of a case at a motion for a preliminary injunction and refuse to allow plaintiff to proceed to a final hearing on the merits.
>
> 2. Whether a final hearing on the merits of a Complaint for Permanent Injunction is barred by the principles of res judicata or collateral estoppel following a decision adverse to a plaintiff at a motion hearing on a preliminary injunction.
>
> 3. Whether the court erred in dismissing the Amended Complaint for Declaratory Judgment and Permanent Injunction without stating reasons for the dismissal and without granting leave to amend.
>
> 4. Whether the defendant hospital failed to follow its by-laws in summarily and permanently suspending the plaintiff and whether the trial court committed error in ruling that the violations of the by-laws by the defendant hospital which the court found to exist resulted in no unfairness or prejudice to the plaintiff.
>
> 5. Whether the trial court abused its discretion in refusing to

grant injunctive and declaratory relief by annulling the action of the defendant hospital in suspending plaintiff's medical staff privileges after the court made the finding of fact that the defendant hospital had failed to follow its by-laws in so imposing the suspension."

In his brief the plaintiff asserts that "the trial court erred and abused its discretion in not granting the plaintiff his relief by way of preliminary injunction to which he would be entitled based upon the clear finding of the court that the hospital failed to follow its by-laws." The decision to grant or deny a preliminary injunction rests in the sound discretion of the trial judge, and appellate review is restricted to a determination of whether the trial court correctly exercised its broad discretionary powers. (*Central Building & Cleaning Co. v. Vodnansky* (1980), 84 Ill. App. 3d 586, 406 N.E.2d 32.) As we said in *P.S.L. Realty Co. v. Granite Investment Co.* (1976), 42 Ill. App. 3d 697, 356 N.E.2d 605, the purpose of a preliminary injunction is not to decide the controverted facts or merits of a case. A preliminary injunction is merely provisional in nature and concludes no rights, its office being merely to preserve the status quo until a final hearing on the merits. In order for a preliminary injunction to issue, the plaintiff must establish by a preponderance of the evidence that he possesses a right that needs protection, that irreparable injury will occur if the injunction is denied, that no remedy at law exists, and that the probability of success on the merits of the case exists. (*Knapp v. Palos Community Hospital* (1984), 125 Ill. App. 3d 244, 465 N.E.2d 554; *Central Building & Cleaning Co. v. Vodnansky* (1980), 84 Ill. App. 3d 586, 406 N.E.2d 32.) It is well established in Illinois that a private hospital's refusal to appoint a physician to its medical staff is not subject to judicial review, the rationale behind the rule being the unwillingness of the court to substitute its judgment for that of private hospital authorities. (*Knapp v. Palos Community Hospital* (1984), 125 Ill. App. 3d 244, 465 N.E.2d 554.) The only exception to the rule of nonreview that has developed in this jurisdiction is that when a physician's existing staff privileges are revoked or reduced, a private hospital must follow its own bylaws in so doing or be subject to limited judicial review. (*Knapp v. Palos Community Hospital* (1984), 125 Ill. App. 3d 244, 465 N.E.2d 554; *Jain v. Northwest Community Hospital* (1978), 67 Ill. App. 3d 420, 385 N.E.2d 108.) Otherwise stated, the general rule is that a court should not act to annul expulsions from hospitals unless unfairness is demonstrated by the fact that the procedures followed violated the constitution or by-laws of the hospital. *Maimon v. Sisters of the Third Order of St. Francis* (1983), 120 Ill. App. 3d 1090, 458 N.E.2d 1317.

■ In his brief, the plaintiff asserts that "the record in this case clearly demonstrates four major violations of the by-laws and several minor ones as well. Only the major ones will be discussed herein." First, and most importantly in the opinion of the plaintiff, the defendant, a private hospital, failed to follow article VIII, section 3, subsection 2, of its bylaws, which provides:

"The notice of hearing shall state in concise language the acts or omissions with which the practitioner is charged, a list of specific or representative charts being questioned, and/or the other reasons or subject matter that was considered in making the adverse recommendation or decision."

Describing the defendant's alleged omission in this regard as the "most clear and fundamental violation of the by-laws in this case," the plaintiff complains that the defendant failed to give him notice of the hearing of the ad hoc committee in the manner required by this subsection. Specifically, he maintains that the acts or omissions with which he was charged were not stated in concise language and that he did not receive a list of specific or representative charts being questioned. The defendant counters that the defendant was in compliance with the subsection, which, as it points out, is stated alternatively in the disjunctive rather than the conjunctive, and that, further, the plaintiff waived any violation in this regard on the part of the defendant by proceeding with the hearing that evening despite ample opportunity to have the hearing postponed until he had reviewed the charts in question. Citing to the record, the plaintiff states in his brief that "[o]ne of the committee members however indicated a strong preference for the proceeding with the hearing to a conclusion that evening." The plaintiff appears to be referring to the following statement of Dr. Sakran:

"My feeling is that if you want to discuss any tonight that we have the charts. You can hand him the chart. He can review it. He can answer the allegations or comment by looking at the chart. He has the charts in front of him. If it takes ten minutes a chart, that's fine. Fifteen minutes, half hour, that's fine. I think that's what we're trying to do, is resolve this agony for all of us, because I don't feel happy sitting here judging my peer. And I'm sure Dr. Rao wants to finish himself as well."

Having reviewed the record, we think that the trial court did not abuse its discretion in finding that the plaintiff acquiesced in the decision of the ad hoc committee to proceed with the hearing as convened. Although the plaintiff may have preferred to review the charts at a later time, he nevertheless proclaimed repeatedly in response to questions of the members of the committee in this regard that he was at the

disposition of the committee and would do whatever the committee chose to do. The committee, not surprisingly, believed him and acted accordingly. Displeased with the review of his suspension, he will not, after having assured the committee that to proceed was agreeable to him, be heard to say that he was prejudiced by the defendant's failure to provide him in advance of the hearing with the charts being questioned of the defendant's failure otherwise to abide by this provision of its bylaws.

■ The second violation by defendant of its bylaws alleged by the plaintiff is its failure to follow article VIII, section 5, subsection 8, which provides in pertinent part:

> "The Executive Committee, when its action has prompted the hearing, shall appoint one of its members or some other Medical Staff member to represent it at the hearing, to present the facts in support of its adverse recommendation, and to examine witnesses. *** It shall be the obligation of such representative to present appropriate evidence in support of the adverse recommendation ***, but the affected practitioner shall thereafter be responsible for supporting his challenge to the adverse recommendation by an appropriate showing that the charges or grounds involved lack any factual basis or that such basis or any action based thereon is either arbitrary, unreasonable or capricious."

The plaintiff contends that

> "[b]ecause no member of the Executive Committee was there to face Dr. Rao and present the facts supporting the adverse recommendation (in other words to act as prosecutor) that function devolved upon the five members of the Ad Hoc Committee itself who were then placed in the position of having to interrogate and prosecute Dr. Rao as opposed to remaining in a neutral and impartial role as hearing and fact finding officers. Thus the committee members were forced to become both 'prosecutors and jury' in considering the charges made against Dr. Rao."

Contrary to the plaintiff's suggestion, the provision does not require the presence of the representative of the executive committee at the hearing of the ad hoc committee. Although the representative who is absent from the hearing runs the risk of failing to satisfy his obligation of presenting appropriate evidence in support of the adverse recommendation of the executive committee, his or her absence would seem, if anything, to inure to the benefit of the practitioner against whom the representative would be proceeding. We think that, insofar as the plaintiff seeks to equate the procedures outlined in this subsection with

the procedures required in a criminal prosecution, his interpretation is unwarranted. Especially is this so in view of the provision of article VIII, section 5, subsection 7, which states that "[t]he hearing need not be conducted strictly according to rules of law relating to the examination of witnesses or presentation of evidence." Inasmuch as subsection 8 does not require the representative of the executive committee to be present at the hearing, the absence of the representative from the hearing could not have constituted a violation of his provision of the defendant's bylaws.

The third violation of the bylaws that the plaintiff alleges is related to article VIII, section 5, subsection 9, which provides in pertinent part:

"The affected practitioner shall have the following rights: to call and examine witnesses, to introduce written evidence, to cross-examine any witness on any matter relevant to the issue of the hearing, to challenge any witness and to rebut any evidence."

According to the plaintiff, the violation consists in the absence of witnesses from the executive committee or medical staff whom the plaintiff could cross-examine. However, the subsection provides the right to cross-examine any witness; it does not require the presence of witnesses to be cross-examined. Hence, the absence of witnesses from the executive committee or the medical staff could not have constituted a violation of the defendant's bylaws.

The fourth and final violation of the bylaws discussed by the plaintiff is related to article VII, section 2, subsections 1 and 4, concerning summary suspension. Subsection 1 provides:

"Any one of the following: the Chairman of the Executive Committee, the President of the Medical Staff, the chairman of a clinical department of the physician, the Chief Executive Officer or the Executive Committee of either the Medical Staff or the Governing body shall each have the authority, whenever action must be taken immediately in the best interest of patient care in the Hospital, to summarily suspend all or any portion of the clinical privileges of a practitioner, and such summary suspension shall become effective immediately upon imposition."

Subsection 4 provides:

"Immediately upon the imposition of a summary suspension, the Chairman of the Executive Committee or responsible departmental chairman shall have authority to provide for alternative medical coverage for the patients of the suspended practitioner still in the Hospital at the time of such suspension. The

wishes of the patients shall be considered in the selection of such alternative practitioner."

The plaintiff maintains that subsection 4 shows that summary suspension is a "drastic measure employed only when a physician's conduct or condition threatens immediate patient harm" and that such was not the case with regard to the conduct of which he was accused. "The inappropriateness of the imposition of summary suspension by the Chairman of the Executive Committee is," the plaintiff urges, "most dramatically highlighted by the fact that in the March 12, 1984, letter, the hospital states that Dr. Rao may continue to see and treat the patients he presently had admitted to the defendant hospital but that he will be no longer allowed to admit new patients. This is clearly inconsistent with the suggestion that 'imminent or immediate patient harm' is threatened by Dr. Rao's conduct." The plaintiff argues that the defendant should have proceeded to investigate his medical practices under another section of the bylaws whereby the affected practitioner is permitted to make an appearance before the executive committee prior to the reduction or suspension of clinical privileges. The determination of whether the action of summary suspension must be taken immediately in the best interest of patient care in the hospital would seem to fall within the ambit of judgment best exercised by hospital authorities and for which the court is unwilling to substitute its own judgment. Inasmuch as this determination is properly a medical one to be addressed to the discretion of medical professionals, we consider that aspect of subsection 1 not to be subject to judicial review. Therefore, the determination of whether the chairman of the executive committee needed to suspend the defendant's privileges immediately in the best interest of patient care in the hospital is beyond the scope of judicial review.

We note that the plaintiff relies on the case of *Poe v. Charlotte Memorial Hospital, Inc.* (W.D.N.C. 1974), 374 F. Supp. 1302. However, *Poe* is inapposite since the hospital involved there was a public corporation and the issue presented was whether, in the administration of their public duties of determining who practices medicine and surgery in the hospital, the defendants observed the due process or procedural fairness requirements of the Constitution of the United States.

■ The doctrine of *res judicata* is that a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand, or cause of action. (*Hassett Storage Warehouse, Inc. v. Board of Election Commissioners* (1979), 69 Ill. App. 3d 972, 387 N.E.2d 785.)

Inasmuch as the doctrine of *res judicata* involves a final judgment on the merits and the purpose of a preliminary injunction is to preserve the status quo until a final hearing on the merits, not to decide finally the controverted facts or merits of a case, we reject the defendant's contention that the trial court's disposition with regard to the preliminary injunction could have been *res judicata* as to a permanent injunction. Insofar as the trial court considered the merits of the case in its disposition concerning the preliminary injunction, it committed error. However, on the basis of the evidence before the trial court, it could well have found that the plaintiff failed to show the probability of his success on the merits of the case. Consequently, it was not an abuse of discretion for the trial court to have denied the preliminary injunction.

On appeal, the plaintiff contends that the trial court found that the defendant had not violated its bylaws and has sought appellate review of the question. Although we think such a determination was anticipatory on the part of the trial court, we consider the question on review with regard to the four provisions of the bylaws claimed by plaintiff to have been violated and discussed at length by him in his brief. We have determined that in the case of two of the provisions the defendant could not have violated them, and in the case of the other two, because of waiver in the one instance and nonreviewability in the other, it must be deemed not to have violated them.

Because the purpose of a preliminary injunction is not to decide the merits of a case, the plaintiff should, if he so wishes, be permitted a hearing on the merits pursuant to his amended petition for a permanent injunction. Although we do not know what evidence he might wish to introduce at such a hearing, especially in view of the limitations imposed by the determinations we have made here concerning the four provisions of the bylaws presented for review, the plaintiff should, nevertheless, have the opportunity for such a hearing if he is desirous of one.

For these reasons the order of the trial court denying the temporary injunction is affirmed, and the order of the trial court granting the defendant's motion to dismiss the plaintiff's amended petition for permanent injunction and declaratory judgment is reversed and the cause remanded to the trial court with the limitations here imposed.

Affirmed in part; reversed in part and remanded with directions.

KASSERMAN, P.J., and KARNS, J., concur.