THE PEOPLE *ex rel.* MICHAEL WITTE, Director, Illinois Department of Conservation, Plaintiff-Appellee, v. BIG CREEK DRAINAGE DISTRICT NO. 2, Defendant-Appellant (David Diehl, Intervenor).

Fifth District   No. 5—86—0653

Opinion filed July 31, 1987.—Rehearing denied August 31, 1987.

Sara Nierste, of Ronald E. Osman & Associates, Ltd., of Dongola, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Bret A. Rappaport, Assistant Attorney General, of Chicago, of counsel), for appellee Illinois Department of Conservation.

PRESIDING JUSTICE KARNS delivered the opinion of the court:

The People, on the relation of the Director of the Illinois Department of Conservation, brought this suit against Big Creek Drainage District No. 2 to enjoin it from undertaking any activities, other than minor maintenance involving less than $100 in expenditures and two man-hours' labor, in the Cache River Basin in Pulaski County without notice to the Department of Conservation and hearing pursuant to section 4—19 of the Illinois Drainage Code. (Ill. Rev. Stat. 1985, ch. 42, par. 4—19.) The complaint prayed for both preliminary and permanent injunctive relief.

After hearing, the circuit court of Pulaski County entered a preliminary injunction enjoining the Drainage District from removing a low water structure across the Cache River known as the Button Land Swamp Dam located on the land of intervenor, David Diehl, pending final determination of the cause. The District has perfected this interlocutory appeal under Supreme Court Rule 307(a). 107 Ill. 2d 307(a).

The Lower Cache River Natural Area, often referred to as the Button Land Swamp, encompasses a narrow, nine-mile area on either side of the Cache River in Pulaski County. The Department of Conservation owns 657 acres in the swamp, a natural area which displays its original, historic character, including native plants and animals. The swamp, a wetland, is a National Natural Heritage Landmark. It contains many endangered species of plants and animals. The area was described by Dr. Harris, professor of geology at Southern Illinois University as an abandoned valley, once part of the Ohio River.

Numerous expert witnesses testified on behalf of plaintiff regarding the uniqueness of the swamp. Perhaps the most impressive plants found in the swamp are the large cypress and tupelo trees, one being over 500 years old, the largest in this country. The rarest animal

found in the swamp is the Indiana bat, listed on the Federal Endangered Species list , as is the river otter, also found in the swamp.

The significance of the swamp can be summarized in the words of Professor Brandon, chairman of the department of zoology at Southern Illinois University:

> "The Cache River Valley is significant zoogeographically because it contains the last Illinois remnants of a once extensive gulf coastal plain pleistocene swampland and harbors some of the northernmost austroriparian habitats and associated fauna. This southern flood plain habitat is of extremely limited extent in Illinois today, but what remains is still relatively high quality. Many Illinois species of amphibians and reptiles more characteristic of the Gulf coastal plain reach the northern limit of their ranges in extreme Southern Illinois; for example, mole salamander, dusk salamander, bird voiced tree frog, green tree frog, narrow mouthed toad, and mud snake."

The structure in question is a low water dam constructed of rock, approximately three feet in height. It was built in 1982 by the Citizens to Save the Cache, a not-for-profit corporation, on the property of David Diehl with permission of the Army Corps of Engineers, but not the formal permission of defendant Drainage District, although with the knowledge of at least one commissioner and defendant's acquiescence until 1986. The Corps of Engineers has taken the position that it has no jurisdiction to interfere in the removal of the structure because it does not affect the "waters of the United States." In 1986 Diehl granted the Department of Conservation a 25-year lease of the structure. Also interested in preserving the lower Cache River Basin is the Nature Conservancy, another not-for-profit corporation.

This dispute is between the Drainage District, which feels obliged to undertake dredging and clearing activities in the area in furtherance of the agricultural interests of those residing in the District, and the Department and other conservationists. The general area has periodically been subject to flooding.

The dam serves to keep a base level of water in the swamp during periods of low flow in the Cache River. An expert in hydrology testified the structure has little effect on drainage, as water simply flows over it during periods of high water, although the commissioners of defendant District, farmers, thought the structure was harmful to agriculture because it held back water in their opinions, which were not based on any scientific study. In addition to removing the dam, there was testimony that the commissioners thought it would be necessary to dredge the Cache River and Cypress Creek, and create another

outlet to effect more complete drainage. The commissioners sought no outside expert information regarding the environmental impact of removing the dam.

Dr. Michael Dimissie, a hydrologist employed by the Illinois State Water Survey, testified that a study was currently being made of the Lower Cache River area by a task force consisting of five State agencies, the Departments of Agriculture, Energy and Natural Resources, Conservation, and the Illinois Environmental Protection Agency, to develop a long-range plan for the entire area, taking into account the agricultural needs of the area. Complete hydrologic data on the area is lacking so that no reasoned decision on changing the drainage pattern in the Cache River Basin can be made before completion of the study. The Cache River is not the main channel carrying water from the basin.

Dr. Dimissie testified that if the dam were not present, a portion of the swamp could become dry during a drought period. Plaintiff's experts testified that the absence of water from the swamp would have disastrous consequences on the plants and animals that live in the swamp. One could reasonably conclude from the testimony of defendant's commissioners that its long-range purpose is precisely that, to drain the swamp. Admittedly, the swamp existed prior to the existence of the dam, but defendant had previously undertaken other drainage measures by dredging and clearing other water channels. Commissioner Inman testified, "[I]f we had the money, we'd try to dredge the whole thing."

Andy West, a biologist for the Illinois Department of Conservation, testified that siltation is one of the major threats to the area and that prior work undertaken by defendant had increased siltation and reduced the water quality.

In its order granting a preliminary injunction preventing the removal of the dam, the trial court observed that it was not deciding the case on its merits but was maintaining the status quo until it decided after full hearing whether the dam is an artificial impoundment permitted by section 2—12 of the Drainage Code or an obstruction, if indeed it does obstruct, prohibited by section 12—3 of the Code. (Ill. Rev. Stat. 1985, ch. 42, pars. 2—12, 12—3.) The court found that the plaintiffs had submitted sufficient evidence to prove the likelihood that they would prevail on the merits.

■■ The discretion of the trial court to grant a preliminary injunction is broad and before a reviewing court will reverse the decision of the trial court it would have to find a clear abuse of discretion. *Rao v. St. Elizabeth's Hospital* (1986), 140 Ill. App. 3d 442, 456, 488 N.E.2d

685, 694.

■ The test to be applied by the trial court in deciding to grant or deny a preliminary injunction is well established. The plaintiff must establish by a preponderance of the evidence that it has a protectable right, that irreparable injury may occur if injunctive relief is denied, that it has no adequate remedy at law and that there exists a reasonable likelihood or probability of success on the merits. It is sometimes stated as an additional requirement that the trial court must find that the benefits in granting the preliminary injunction outweigh any possible harm that the defendant might suffer therefrom. *Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 891, 480 N.E.2d 1273, 1278.

■ Clearly, the Department of Conservation possesses a protectable right in the swamp, the Lower Cache River Basin, and in the particular subject of the preliminary injunction, the low water structure or dam. It owns land in the area and is the lessee of the structure in question. The Department is charged by statute with a duty to conserve and protect the natural resources of the State (Ill. Rev. Stat. 1985, ch. 127, pars. 63(a)(1),(2)). It has a duty to conserve and protect endangered and threatened animals (Ill. Rev. Stat. 1985, ch. 8, par. 341(a)).

The defendant relies on the common law right of owners of land to have surface water flow by natural courses onto lower riparian lands, a subject recently before this court in *Bodenschatz v. Parrott* (1987), 153 Ill. App. 3d 1008, 506 N.E.2d 617. The general civil law rule followed in Illinois is "[w]here water from one tract of land falls naturally upon the land of another, the owner of the lower land must suffer the water to be discharged upon his land and has no right to stop or impede the natural flow of the surface water." (*Gough v. Goble* (1954), 2 Ill. 2d 577, 580, 119 N.E.2d 252, 254.) As between private landowners, the owner of the servient tenement cannot by artificial structures impede the natural flow of surface water from the dominant estate.

Citing the broad statutory powers of drainage districts to keep the drains in a district in operation and repair (Ill. Rev. Stat. 1985, ch. 42, par. 4—15), and the duty of a drainage district to promote drainage for agricultural purposes (Ill. Rev. Stat. 1985, ch. 42, par. 12—17), the District argues that it has, at a minimum, all the rights of the holder of a dominant tenement *vis-a-vis* this structure or dam clearly as to Diehl, a private landowner, and also the Department of Conservation, notwithstanding the latter's statutory mandate to conserve and protect the natural resources of the State. In short, it is the

position of the District that its powers exceed those of the State of Illinois vested by statute in the Department of Conservation.

The District argues that the structure was placed across Cache River on Diehl's property without its consent in violation of section 12–3 of the Drainage Code (Ill. Rev. Stat. 1985, ch. 42, par. 12–3), which provides that the owner of land through which a district has acquired a right-of-way may not place a permanent structure on the right-of-way without obtaining the express consent of the district. Assuming the Cache River is such a "right-of-way," which is not contested, whether the structure is authorized under section 2–12 (Ill. Rev. Stat. 1985, ch. 42, par. 2–12) as an artificial impoundment not materially impeding the flow of water was not decided by the trial court. Whether Diehl had obtained express consent is not resolved, as it was suggested that the District had no formal procedure to grant consent and consent was obtained from the Corps of Engineers and the State of Illinois. The structure was placed there with the acquiescence of one commissioner and existed for three years without objection. Furthermore, the Department is not a private landowner but is now the lessee of the structure.

In our view the applicability of section 12–3 if originally relevant may be immaterial, as the Department's duties relative to the natural resources of the State and endangered species of animals and plants, if in conflict, may be superior to the powers of the Drainage District, a matter we do not decide on this limited appeal. See *In re East Lake Fork Special Drainage District* (1985), 137 Ill. App. 3d 473, 484 N.E.2d 507.

Defendant would further argue that the Department of Conservation had an adequate remedy at law in that it should have followed section 12–3 of the Drainage Code (Ill. Rev. Stat. 1985, ch. 42, par. 12–3) and requested the consent of the Drainage District or at least requested court permission (Ill. Rev. Stat. 1985, ch. 42, par. 4–26) for a determination of the status of the dam as an artificial impoundment, rather than an obstruction, before placing or maintaining the structure in the Cache River. In substance, this is but a slightly altered version of the District's first argument; that is, the District's powers under the Drainage Code are superior to and need not be harmonized with those of the Department of Conservation.

■ As to the requirement of no adequate remedy at law, this refers only to the adequacy of monetary damages (see *Ajax Engineering Corp. v. Sentry Insurance* (1986), 143 Ill. App. 3d 81, 491 N.E.2d 947). Quite obviously, monetary damages could never compensate for the harm that could result to the swamp if this is established at final

hearing.

As to the District's principal argument, the plaintiff argues that the common law right of natural drainage between landowners is simply irrelevant to the issues before us, that drainage districts, specialized units of local government (Ill. Const. 1970, art. 7, sec. 1), do not have such plenary powers that the powers and duties of departments of State government must yield in the case of conflict or apparent conflict.

The conflict may indeed be apparent, not real. Section 4—15.1 of the Drainage Code (Ill. Rev. Stat. 1985, ch. 42, par. 4—15.1) requires the commissioners of a drainage district to "use all practicable means and measures, including consideration of alternative methods of providing the necessary drainage, to protect such environmental values as trees and fish and wildlife habitat, and to avoid erosion and pollution of the land, water or air." While the District says it complied with this statute, the record establishes that it did so in form only without seeking, in fact rejecting, expert consultation and advice.

■ Sections 4—16 and 4—19 of the Drainage Code (Ill. Rev. Stat. 1985, ch. 42, pars. 4—16, 4—19) require the commissioners to seek court approval when a district undertakes to alter any drain, dredge any drain or do any work requiring the purchase or lease of equipment. Whether the commissioners complied with the mandate of section 4—15.1 is a factor the court should consider in granting or denying permission for such proposed work. The Department argues the District must also comply with the Endangered Species Act (Ill. Rev. Stat. 1985, ch. 8, par. 331 et seq.). Section 11(b) of that act (Ill. Rev. Stat. 1985, ch. 8, par. 341(b)) states:

> "It is the public policy of all agencies of State and local governments to utilize their authorities in furtherance of the purposes of this Act by evaluating through a consultation process with the Department whether actions authorized, funded, or carried out by them are likely to jeopardize the continued existence of Illinois listed endangered and threatened species or are likely to result in the destruction or adverse modification of the designated essential habitat of such species, which policy shall be enforceable only by writ of mandamus ***."

Here it is clear that the Drainage District did not consult with the Department of Conservation as to the environmental impact on endangered species of its proposed action in Button Land Swamp even though a proposed rule of the Department, suggested in implementation of section 11(b) of the Act, requires such consultation. (Ill. Reg. Vol. 10, no. 50, p. 20344 et seq.) Plaintiff even suggests, without argu-

ment, that the proposed action of the District may violate the Federal Endangered Species Act (see 16 U.S.C. sec. 1531 *et seq.* (1982)).

■ The District argues that there was no credible testimony that removal of the dam would result in irreparable harm to the swamp, noting that the swamp existed prior to the installation of the dam.

From the evidence before the trial court, it could well conclude that the District's past activities in dredging and clearing, the removal of the dam and the further dredging of the Cache River, which one could reasonably conclude was in the District's future plans, could well result in the drying up of the swamp with disastrous consequences to the unique plant and animal life.

Before the court was the 1986 report of the United States Department of Interior annual report to Congress on damage or threatened damage to the 561 National Natural Landmarks. As to the Lower Cache River the report stated:

"Diversion and channelization of the lower Cache River has created a settling basin downstream. Increased siltation is resulting, which in time will replace the swamp with dry land. Several State agencies are working to solve the problem. The Corps of Engineers has received general authorization for a study on the Cache River Basin, but funding has not yet been allocated for the project."

The conclusion of this report is well supported by the expert testimony before the court. Clearly, the finding of irreparable harm is not against the manifest weight of the evidence.

■ We have suggested that the powers and duties of the Drainage District may be reconciled with the rights of the Department in protecting what it perceives to be the public interest in this natural resource of the State. The Department argues that the District has failed to follow the statutory duty imposed on it under the Drainage Code (Ill. Rev. Stat. 1985, ch. 42, pars. 4—15.1, 4—16), and section 11(b) of the Illinois Endangered Species Act (Ill. Rev. Stat. 1985, ch. 8, par. 341(b)), matters we should not decide in this interlocutory appeal, which we raise only to show that plaintiff has satisfied the requirement of a reasonable likelihood of success on the merits. A preliminary injunction is provisional and looks toward the final hearing of the cause. An applicant for a preliminary injunction need only raise a reasonable question of likelihood of success at final hearing. We believe the Department has clearly satisfied this requirement.

■ Finally, do the benefits of granting the preliminary injunction outweigh any harm that the District might suffer? We believe clearly so. The record before us suggests that this structure has little effect

on flooding. One might wonder why the District would undertake its proposed action prior to the completion of the hydrologic report of the study of the Governor's Cache River Task Force which is considering the interest of all parties, including agricultural interest. Before the trial court was substantial evidence that the past and projected activities of the Drainage District in the swamp could have permanent adverse consequences to this significant national and State landmark.

The judgment of the circuit court of Pulaski County is affirmed.

Affirmed.

KASSERMAN and WELCH, JJ., concur.