A. CURRIE MAIMON, M.D., Plaintiff-Appellee, *v.* THE SISTERS OF THE
THIRD ORDER OF ST. FRANCIS, Defendant-Appellant.

Fourth District   No. 4—83—0359

Opinion filed December 30, 1983.

Stephen T. Moore, of Thomas, Thomas, Keeling & Moore, of Rockford, for appellant.

John M. Bowlus, of Chicago, and John C. Mulgrew, Jr., of Davis & Morgan, of Peoria, for appellee.

PRESIDING JUSTICE MILLS delivered the opinion of the court:

Dr. Maimon was expelled from hospital staff privileges.

He sought—and obtained—a permanent injunction against the hospital from carrying out that expulsion.

The injunction was improvidently granted.

We reverse and remand.

The order below granted Dr. Maimon summary judgment and permanently enjoined the religious order from expelling him from admitting privileges at St. Anthony's Hospital based upon the charges which make up the facts of this appeal.

## FACTS

On March 17, 1982, the board of managers of St. Anthony's Hospital in Rockford, Illinois, voted to affirm the expulsion of Dr. Currie Maimon, M.D., from staff privileges. The recommendation had been formulated and approved following two committee meetings held by the hospital staff, both recommending that Dr. Maimon be expelled.

The expulsion followed 1½ years of confrontations between Dr. Maimon and various members of the hospital administration. The culmination of the prior 1½ years occurred on May 1, 1981, when Dr. John Tillis, secretary of St. Anthony's ad hoc obstetrics/gynecological (OB/GYN) executive committee, sent a letter to Dr. Joseph Perez, chairman of St. Anthony's credentials committee, indicating that Dr. Maimon may have been involved in improper conduct in an obstetrical case. The gist of the complaint was that Dr. Maimon had attempted to induce labor in a pregnant patient in an effort to convenience himself rather than in the best interests of his patient. Dr. Tillis' letter prompted Douglas Bruce, the administrator and chief executive officer of the hospital—in consultation with Dr. Harold Zenisek, the hospital chief of staff—to request the credentials committee to take corrective action against Dr. Maimon.

The credentials committee met on May 7, 1981, to consider the request for expulsion. Pursuant to St. Anthony's bylaws, Dr. Zenisek sat as a member ex officio of the committee, without vote. The committee voted to recommend the expulsion of Dr. Maimon.

Dr. Maimon appealed the credentials committee's adverse recommendation pursuant to St. Anthony's bylaws. The appeal took the form of a full hearing before an ad hoc committee selected from the entire medical staff. The first hearing was convened August 4, 1981. Just prior to the taking of testimony on that day, the parties settled on four specific charges which were to be preferred. The charges were:

> "a. That during the time when he was allegedly suspended from admitting patients to the hospital he made entries on a patient's charge and removed an EKG strip from the hospital in violation of hospital rules.
>
> b. That during the same period of suspension he admitted a patient to the hospital and participated in the patient's treat-

ment.

 c. That he failed to cooperate with the Professional Services Review Organization (PSRO) in four cases.

 d. That he administered a drug to a pregnant patient to induce labor in violation of hospital rules."

On December 4, 1981, the *ad hoc* committee made a written report to the board of managers of the hospital recommending that Dr. Maimon be expelled. The vote was six in favor of expulsion, two opposed. On March 17, 1982, the board of managers affirmed the recommendation of expulsion effective April 1, 1982.

On March 30, 1982, Dr. Maimon filed a complaint in circuit court seeking injunctive and other relief accompanied by a motion for a temporary restraining order or preliminary injunction. A temporary restraining order was entered on March 31, 1982, and formalized April 5, 1982. A preliminary injunction was issued on April 30, 1982. The cause was heard in the lower court on cross-motions for summary judgment. On February 7, 1983, the court below granted Dr. Maimon's motion for summary judgment and ordered that the hospital be permanently enjoined from expelling him, or interfering in any way with his staff privileges, based upon matters presented to the *ad hoc* committee. The hospital filed a motion for rehearing which was denied May 2, 1983.

### GENERAL RULE

■■ ■ Before discussing the procedures involved in this case, we note the general rule in cases such as this is that a court should not act to annul expulsions from hospitals unless unfairness is demonstrated by the fact that the procedures followed violated the constitution or bylaws of the hospital. (See *Jain v. Northwest Community Hospital* (1978), 67 Ill. App. 3d 420, 385 N.E.2d 108.) Our supreme court has carved out one narrow exception to what we view as the general rule of nonreview. In *Van Daele v. Vinci* (1972), 51 Ill. 2d 389, 282 N.E.2d 728, the court found that the record of the proceedings clearly demonstrated partiality or bias on the part of the body which actually expelled the plaintiff. In *Van Daele*, several members of the board were named defendants in a derivative suit brought by the expellees. In this suit there is no question about any potential bias or impartiality of any of the members of the board of governors or the Sisters of the Third Order of St. Francis which was the body which actually expelled Dr. Maimon. Under these circumstances we find that *Van Daele* has no application to the case before us. We are left with the problem of determining whether the procedures followed

by the hospital in recommending Dr. Maimon's expulsion were in accordance with bylaws. If the procedures were in accordance with hospital bylaws, the circuit court should not have passed on this case in the first instance.

## BYLAWS

We turn now to the asserted bylaw violations. In the trial court, Dr. Maimon asserted that his expulsion was void based on two alleged violations of hospital bylaws which resulted in prejudice. The *first* violation occurred when Dr. Zenisek, the hospital chief of staff, sat on the credentials committee which first recommended Dr. Maimon's expulsion and also sat on the *ad hoc* committee which reviewed the recommendation. This alleged violation was cited as a ground in the trial court's order granting Dr. Maimon summary judgment and enjoining the hospital from undertaking any other disciplinary proceedings based on the matters raised before the *ad hoc* committee. The *second* alleged violation occurred when the *ad hoc* committee ruled that Dr. Maimon's case was properly before it, without it first having been heard by a committee of members of the family practice department, where the doctor held staff privileges. Dr. Maimon claimed that hospital bylaws required such a procedure.

### A. DR. ZENISEK'S DUAL PARTICIPATION

Before we can decide whether Dr. Zenisek's participation on both the credentials and *ad hoc* committees violated the bylaws of the hospital, we must first decide whether there was a bylaw to violate.

Article VIII of St. Anthony's bylaws establishes procedures for hearings. Section 4 of article VIII states:

"All hearings shall be held in accordance with procedural safeguards *such as* those outlined in pages 22 to 26 of 'Guidelines for the Formulation of Medical Staff Bylaws, Rules, and Regulations 1971,' by the Joint Commission on Accreditation of Hospitals [JCAH]." (Emphasis added.)

The pertinent portion of the JCAH guidelines states:

"Section 4. Composition of the hearing committee.

a. When a hearing relates to an adverse recommendation of the executive committee, such hearing shall be conducted by the Ad Hoc Hearing Committee of not less than _____ members of the medical staff appointed by the president of the medical staff in consultation with the executive committee and one of the members so appointed shall be designated as chairman. *No staff member who has actively participated in the con-*

*sideration of the adverse recommendation shall be appointed a member of this hearing committee unless it is otherwise impossible to select a representative group due to the size of the medical staff."* (Emphasis added.)

Both parties join issue as to whether the bylaws effectively adopted the guidelines and whether Dr. Zenisek's actions violated them. The hospital argues that the guidelines were not adopted, citing the case of *Settler v. Hopedale Medical Foundation* (1980), 80 Ill. App. 3d 1074, 400 N.E.2d 577. The doctor has offered no cases in support of his view that the bylaws, by their plain language, adopt the guidelines.

Although we find it very difficult to determine from the opinion, *Settler* appears to be distinguishable from the case at the bench. Written in 1980, *Settler* was most likely dealing with a different publication of JCAH than is present in the instant case. The 1971 guidelines to which St. Anthony's bylaws refer were superseded in 1978 by what are now called the JCAH Model By-Laws. *Settler* concluded that in light of specific language in the JCAH publication before it, each hospital had to formally adopt the model bylaws to make them effective. The court there refused to find that the bylaws were effective based solely on the fact that the hospital was a participating JCAH member. By similar reasoning, defendant here argues that the 1971 guidelines cannot be adopted by reference as was apparently sought to be done in the bylaws.

■ Several pages of the 1971 publication to which St. Anthony's bylaws refer were part of the record in the case before this court. The language upon which the *Settler* court relied was not. Under these circumstances we cannot conclude that the 1971 guidelines required *specific adoption* in order to be effectively made part of the hospital bylaws. This leaves only the language of the bylaws themselves with which to determine whether the guidelines were actually adopted.

■ ■ The rule in Illinois is that words of corporate bylaws are to be interpreted in their ordinary, popular sense. (*Nelson v. Board of Trade* (1895), 58 Ill. App. 399.) Looking at the relevant portion of St. Anthony's bylaws, it seems more likely than not that the drafters were seeking to incorporate by reference all the procedural safeguards found in the 1971 JCAH guidelines despite the inartful (*inept* may be more precise) drafting. At oral argument, the point was made that the term "such as" has little or no contextual meaning if it does not mean the guidelines were being adopted *in toto*. We decline to render such an affirmative expression of intent nugatory and find that the bylaws adopted the 1971 JCAH guidelines.

■ As previously noted, the guidelines exclude participation on a hearing committee by any staff member who has "actively participated" in the formulation of the charges against the individual sought to be discharged. So it seems that if Dr. Zenisek did not "actively participate" on the credentials committee, no violation of the bylaws occurred. The lower court made no finding on the extent of Dr. Zenisek's participation, finding instead that his participation without more created such a probability of bias or prejudice that it was a *per se* violation of the bylaws. We do not agree.

As chief of staff, Dr. Zenisek was a member *ex officio* of the credentials committee without vote. Our review of the record of the hearings before the credentials committee reveals six instances of participation by Dr. Zenisek. The first was a direct reply to a question posed by another member of the committee. The second was his expression that he thought he had seconded a prior motion which was before the committee and his indication that he was willing to withdraw his second. The third was a question concerning the presence of legal representatives at further committee meetings. In the fourth instance, Dr. Zenisek asked if the committee was ready to move the question before it. The fifth instance was an expression of his opinion that Dr. Maimon had a right to appeal the decision of the credentials committee. The last instance of participation was Dr. Zenisek's expression of his opinion that the committee was bound to protect both the interest of Dr. Maimon and the hospital. We further note that by virtue of his position as chief of staff, Dr. Zenisek cast no vote at the credentials committee hearings.

■ Under these circumstances, we find that Dr. Zenisek's participation on the credentials committee could hardly be termed "active" and that no violation of the bylaws occurred. We note incidentally that Dr. Zenisek's participation on the *ad hoc* committee was also innocuous but that according to the bylaws a member who had not actively participated on the first committee could become Torquemada reincarnate on the second committee and not violate the bylaws. Viewed as a whole, we find that Dr. Zenisek's participation was neither unfair nor violative of the bylaws and afforded inadequate ground upon which the lower court might stand in order to entertain this case.

### B. REQUEST FOR CORRECTIVE ACTION

The second ground upon which the court relied for its decision to overturn and enjoin the attempt to expel Dr. Maimon from the staff at St. Anthony's was that there had been a conscious violation of St. Anthony's bylaws pertaining to the various staff bodies which could

or should have heard the charges against him. The pertinent portions of the bylaws state:

## "ARTICLE VII: CORRECTIVE ACTION

Section 1. Procedure

\* \* \*

b. Whenever the corrective action could be a *reduction or suspension of clinical privileges*, the credentials committee shall forward such request to the chairman of the department wherein the practitioner has such privileges. Upon receipt of such request, the chairman of the department shall immediately appoint an ad hoc committee to investigate the matter.

c. Within seven days after the department's receipt of the request for corrective action, the chairman of the department shall make a report of its investigation to the credentials committee. Prior to the making of such report, the practitioner against whom corrective action has been requested shall have an opportunity offered in writing by certified mail, return receipt requested for an interview with the departmental ad hoc investigating committee. At such interview, he shall be informed of the general nature of the charges against him, and shall be invited to discuss, explain or refute them. This interview shall not constitute a hearing, shall be preliminary in nature, and shall be information gathering in its scope. A record of such interview shall be made by the chairman of the department and included with its report to the credentials committee, and a copy sent to the affected practitioner.

d. Within seven days following the receipt of a request for corrective action, *or* following receipt of a report from a department chairman following the department's investigation of a request for corrective action involving reduction or suspension of clinical privileges, the credentials committee shall take action upon the request. *If the corrective action could involve a reduction or suspension of clinical privileges, or a suspension or expulsion from the medical staff,* the affected practitioner shall be informed by certified mail, return receipt requested, that he is required to make an appearance before the credentials committee prior to its taking action on such a request. This appearance shall not constitute a hearing, and shall be preliminary in nature. A record of such appearance shall be made by the credentials committee.

e. The action of the credentials committee on a request for corrective action may be to reject or modify the request for

corrective action, to issue a warning, a letter of admonition, or a letter of reprimand, to impose terms of probation or a requirement for consultation, to recommend reduction, suspension or revocation of clinical privileges, to recommend that an already imposed summary suspension of clinical privileges be terminated, modified or sustained, or to recommend that the practitioner's staff membership be suspended or revoked. Whatever action the credentials committee recommends shall be transmitted to the practitioner in writing, by certified mail, return receipt requested.

    f. Any recommendation by the credentials committee for reduction, suspension or revocation of clinical privileges, or for suspension or expulsion from the medical staff shall entitle the affected practitioner to procedural rights provided in Article VIII of these bylaws." (Emphasis added.)

In this appeal, the hospital argues that the bylaws provide for direct action by the credentials committee where *expulsion* of a staff member is sought. This is distinguished from situations where the corrective action sought is a *reduction* or *suspension* of clinical privileges.

There is no dispute that where suspension or reduction of privileges is sought, the case must first go to committees from each of the departments where a physician holds staff privileges. The hospital asserts that it would be wasteful to have hearings in every department when the request is that a physician be expelled from all departments. Dr. Maimon responds that all requests for corrective action of any nature must first go to the departments where privileges are held for a first level decision. He argues that if the department of family practice (where Dr. Maimon held staff privileges) had conducted a preliminary investigation, it was entirely possible that the entire proceedings would never have gotten off the ground. In what manner the departmental investigation could have prevented the proceedings from getting off the ground is unclear since the bylaws provide only that the department make a report to the credentials committee. The credentials committee is apparently not bound in any way by the report. The issue before the court, therefore, is the interpretation of the bylaw previously quoted—especially the meaning and interrelationship of the terms "reduction or suspension of clinical privileges, or a suspension or expulsion from the medical staff" found in article VII, section 1(d).

As we proceed along the litany of the procedure section, it is clear that all requests for corrective action must be taken to the credentials committee per article VII, section 1(a). It is equally clear that where the corrective action sought is potentially a reduction or suspension of

clinical privileges, the credentials committee must forward the charges to the appropriate department involved for hearings. Article VII, sections 1(b) and (c) set out the procedures to be followed by the departments. At this point it would appear rather obvious that by virtue of the common sense, plain meaning of "expulsion" it would easily come within the purview of a "reduction in clinical privileges." After all, how much further can privileges be reduced completely than by the act of expulsion? This is essentially the argument made by Dr. Maimon.

Unfortunately, the problem is not amenable to such a ready solution. In the next section of the same article, the bylaws provide that following the receipt of a request for corrective action or the receipt of a departmental report where a reduction of clinical privileges is at stake, the credentials committee shall take action. The paragraph then goes on to establish procedural requirements which must be followed "[i]f the corrective action could involve a reduction or suspension of clinical privileges, or a suspension or expulsion from the medical staff." From the fact that paragraph (d) is the first place in the bylaws where expulsion from the medical staff is contemplated, the hospital argues that paragraphs (b) and (c) are rendered inapplicable to such situations and that only paragraph (d) applies. The hospital supports this view with a policy argument which involves the diseconomy which might result if every department in which an expellee held privileges had to hold an *ad hoc* committee meeting. While the hypothetical presents interesting questions, it is not at issue in this case since plaintiff only held staff privileges in one department.

Dr. Maimon counters this argument with the linguistic argument previously alluded to (reduction of clinical privileges equals expulsion), citing *Nagib v. St. Therese Hospital, Inc.* (1976), 41 Ill. App. 3d 970, 355 N.E.2d 211, as a case where a court flatly rejected the argument that expulsion does not involve a reduction in staff privileges. The hospital replies that the language of the bylaws in *Nagib* was unlike that in the instant case and that it does not torture the principles of set theory to state that reductions are within the parameters of the set of expulsions but that expulsions are not within the parameters of the set of reductions.

The *Nagib* case is illustrative of the problems courts face in the interpretation of hospital bylaws. Dr. Nagib appealed his dismissal from St. Therese Hospital alleging that he had not been allowed an appeal to the full medical staff. The hospital replied that the appeal procedures were not applicable to staff dismissals. The bylaws contained the following provisions relating to dismissals:

" 'Dismissal from the Medical Staff may be initiated either by the Medical Staff or by the Governing Board. Before taking action, the Governing Board shall consult with the Executive Credentials Committee. The physician in question shall be given the opportunity of presenting his explanation of the incident or incidents concerning which complaints may have arisen. Action by the Medical Executive Committee recommending dismissal of a member shall be subject to review by the Governing Board before final action is taken.' " (41 Ill. App. 3d 970, 972, 355 N.E.2d 211, 213.)

The bylaws in *Nagib* also contained a section on appeal which read thusly:

" 'In any case where the Executive Credentials Committee does not recommend reappointment, or where reduction of privileges is recommended, the administrator shall notify the physician concerned and he shall be given an opportunity of appearing before the Executive Credentials Committee. He may request an open hearing before the Medical Staff. After a hearing as outlined above, the Executive Credentials Committee shall make final recommendation to the Governing Board. This recommendation of dismissal or changes in privileges as recommended by the Executive Committee shall be subject to approval by a two-thirds majority of the staff voting at the next duly convened regular staff meeting with a quorum of the staff present.' " 41 Ill. App. 3d 970, 972, 355 N.E.2d 211, 213.

Faced with arguments similar to those presented in this case, the court in *Nagib* found that a reduction of privileges was recommended when the committee recommended a dismissal from the medical staff. The court relied on language of our supreme court in the case of *Bishop v. Bucklen* (1945), 390 Ill. 176, 60 N.E.2d 872, which stated an analogous proposition that a reduction of liability can include a lessening of liability to the point of complete extinction. The court reasoned that in the same manner a reduction of privileges can be considered a lessening of privileges to zero by dismissal.

In our opinion, examination of the two sections of the bylaws in *Nagib* reveals that the reference to "dismissals" in the section on appeals only makes contextual sense if "dismissal" is read to mean refusal to recommend reappointment at the end of a year. The first sentence of the paragraph speaks only of a refusal to recommend reappointment or decision to reduce privileges. The last sentence places appeals, of decisions to recommend dismissal or changes in privileges, before the medical staff. To come to the desired disposition

of the case, the court was forced to stretch logic to the point of finding that a dismissal during the year was a reduction in privileges, which triggered the applicability of the appeals section *in toto*. In so doing, the court glossed over (or perhaps rejected) Dr. Nagib's theory that review of dismissals was covered by the plain language of the section concerning dismissals. The court failed to note that the appeals section speaks first of a refusal to recommend reappointment, or a recommendation of reduction in privileges. These two concepts become "recommendation of dismissal or changes in privileges" in the last portion of the same paragraph. The section on dismissals provides its own review mechanism and deals with different committees.

On balance it seems that the bylaws in *Nagib* make best sense when read as separate, unrelated sections applying to unrelated actions by unrelated committees. The medical executive committee is empowered to recommend dismissal of physicians during their term. The executive credentials committee is empowered to review physicians' work records at the end of each one-year term of employment and recommend retention or nonretention ("dismissal" in the appeals section). Dividing the duties between two committees makes sense since different inquiries and machinery are appropriate for the different operations. Similarly, different machinery for appeal are also appropriate. The court in *Nagib* found it illogical that the decision to dismiss a doctor in midterm would be subject to a different appeals process than the decision not to reappoint at the end of a year— but gives no reasons why.

We do not find it illogical at all! The decision to dismiss during a term is more likely to be based on potentially volatile personal issues or patient endangerment, whereas a decision to not reappoint at the end of a given year may be based on numerous mundane staffing decisions of the hospital. It might be very important to adopt streamlined procedures where potentially injurious situations require quick conciliation. Under these circumstances, the inconvenience of gathering the entire staff to hear the case would counter the need for effective action. (We note that in Dr. Maimon's case it took four months for the *ad hoc* committee to come to a decision even though only eight doctors were involved.)

Since we find the result in *Nagib* to be based on faulty reasoning, we decline to adopt its conclusion that a reduction in privileges necessarily equals an expulsion from the medical staff.

■ We now undertake an independent examination of the bylaws in the instant case. We note first that section (b) of the bylaws contains no mention of staff expulsions whatsoever. On the other hand,

section (d) specifically speaks to "*** a reduction or suspension of clinical privileges, or a suspension or expulsion from the medical staff ***" and then details the procedures which must be followed prior to appearing before the *credentials committee*, not departmental committees. Were we to adopt Dr. Maimon's suggested reading of section (b) (that a reduction of privileges included an expulsion from staff), we would be forced to recognize a logical redundancy in section (d) which addresses both concepts. This we spurn. To our view, section (d) shows that the drafters of the bylaws recognized a distinction between staff expulsions and reductions in staff privileges. This view is consistent with the principle of plain meaning interpretation noted above. Despite the view of our supreme court in *Bishop* that a reduction of liability may include the exclusion of liability, we find that by using the term "reduction" in the procedural recipe here, the drafters of the bylaws must have contemplated a residue or essence, not the dry pot which expulsion would bring forth.

■ We note also that the bylaws are cast entirely in the disjunctive. Section (d) contemplates the receipt by the credentials committee of *either* a general request for corrective action *or* a report from a department, and then sets forth procedures which must be followed, specifically mentioning for the first time the possibility for expulsion from the medical staff but again using the disjunctive "or." The use of the disjunctive ordinarily signals a situation wherein one of several possible solutions will satisfy selective criteria. Here, a request for *expulsion* from staff privileges satisfies the selective criteria channeling such requests to the credentials committee. To the contrary, the selective criteria set forth by the disjunctive construction of section (b) is satisfied by *either* a request for reduction *or* suspension of staff but not, by its plain language, by a request for expulsion from the staff.

■ If the drafters had intended that questions of expulsions were to be referred to the departments in which physicians held privileges, it seems more likely than not that such actions would have been mentioned in section (b). They were not. Since they were not, we feel the hospital acted within the bylaws by referring Dr. Maimon's case first to the credentials committee. Review was then properly had before an *ad hoc* committee of staff members per Dr. Maimon's request.

■ We further find that such a procedure is fundamentally fair. Since there was no bylaw violation and no inequitable treatment of Dr. Maimon, the trial court acted improvidentaly in entering this case, since, as previously mentioned, courts should not do so unless fundamental unfairness is manifested by bylaw violations. We therefore reverse the trial court in order that Dr. Maimon's expulsion be rein-

stated. Our disposition of the case renders moot several other questions raised by the parties in their briefs and arguments before this court.

We reverse and remand with directions to the trial court to enter summary judgment for Sisters of the Third Order of St. Francis, defendant-appellant.

Reversed and remanded with directions.

TRAPP and GREEN, JJ., concur.