ABRAHAM LAPIDOT, Plaintiff-Appellant, v. MEMORIAL MEDICAL CENTER *et al.*, Defendants-Appellees.

Fourth District   No. 4—85—0729

Opinion filed June 10, 1986.

Grady E. Holley, of Holley, Keith & Mehlick, of Springfield, Harlan Heller, Ltd., of Mattoon, and Norman H. Dachs, of Shayne, Dachs, Stanisci &

Corker, of Mineola, New York, for appellant.

Brown, Hay & Stephens, of Springfield (Edward J. Cunningham and William F. Trapp, of counsel), for appellee Memorial Medical Center.

JUSTICE MORTHLAND delivered the opinion of the court:

The medical staff privileges of the plaintiff, a board-certified otolaryngologist (ear, nose, and throat specialist), were terminated by the defendant Memorial Medical Center (Memorial) after that hospital determined the plaintiff had falsely responded to a question in his application for privileges. The plaintiff filed suit seeking reinstatement of those privileges. The circuit court of Sangamon County granted the defendant's motion for summary judgment. Plaintiff appeals, and we affirm.

Plaintiff moved to Springfield in the summer of 1977 to begin an association with the Springfield Clinic, a group of approximately 40 physicians practicing in the Springfield, Illinois, area. Prior to his arrival, he completed a written application for privileges at Memorial. One of the questions in the application read as follows: "Have your privileges at any hospital ever been suspended, diminished, revoked or not renewed?" Plaintiff checked the box marked "no" in response. Staff privileges as an associate member of the medical staff were granted to the plaintiff in August 1977.

However, on February 4, 1978, plaintiff's staff privileges were summarily suspended as a result of certain concerns expressed by Dr. Phillip Myers, his preceptor, and by Dr. John Denby, chairman of the department of surgery. Pursuant to the hospital bylaws, plaintiff requested, and was granted, a hearing before an *ad hoc* committee of the hospital. Notice of the hearing, citing certain patient cases called into question, was sent to the plaintiff on February 8.

Plaintiff arrived at the scheduled February 11, 1978, hearing with his adviser, Dr. Alan Rubenstein, a partner in the Springfield Clinic. Initially, questioning at the hearing focused on the treatment and care of the individual patient cases upon which the subject charges were levied. During the proceedings, discussion shifted to a reference letter from a former colleague contained in the plaintiff's file. The letter alluded to difficulties plaintiff previously experienced at Southside Hospital near Long Island, New York. After first checking with Dr. Rubenstein whether he should "say it all like it is," plaintiff related that a small child upon which he had performed a tonsillectomy had died three weeks after the operation. Apparently, the child had developed a "sudden bleed" at home. Plaintiff stated his staff privileges at

Southside were immediately suspended as of March 30, 1976. On May 12, 1976, the charges against the plaintiff were dropped and he was reinstated to the staff. Plaintiff thereupon resigned from Southside.

When asked by the committee why he did not indicate on his application that his privileges had been suspended before, plaintiff responded that he was not then an active member of that staff. Plaintiff stated he was merely an associate, he was suspended because the "child died," and he was later reinstated because "they had no grounds." He then resigned. Dr. Rubenstein and the plaintiff also made reference to a group of five other practitioners in the area who they believed were jealous of the plaintiff's success, and who did not want plaintiff to be named chief of otolaryngology ahead of one of their own.

The committee then recessed, agreeing to meet once more on February 13. At that time, plaintiff would be allowed to respond to this additional information.

During the February 13 hearing, plaintiff discussed his decision in answering "no" to the question relating to prior suspensions of privileges. He stated he did a "tremendous amount of soul-searching," and contacted several colleagues in New York as to how to answer. Plaintiff told the board he only had temporary privileges at Southside; he had been advised he need not report the suspension because he was not on the active staff there. Plaintiff also believed that the details of his Southside problem were known to members of the Springfield Clinic, many of whom also served on boards and committees at Memorial, and he thought the matter would be brought out anyway. He pointed out once more the fact that he was reinstated, and stressed that he answered "in good faith" and "with sincerity." Plaintiff indicated that some members of the Springfield Clinic also advised him to respond in the negative. In essence, it was plaintiff's "gut feeling" that he had done nothing wrong at Southside, and thus his response on the application was proper.

On February 15, 1978, the *ad hoc* committee voted unanimously to affirm the action of the executive committee suspending the plaintiff. The committee found that the plaintiff's management of the patient cases called into question was "inappropriate." In its written findings, the committee further found the plaintiff's activities and professional conduct in regard to his application response "to be lower than the standards or aims of the Medical Staff." The suspension was upheld on appeal to the hospital governing body.

On February 25, 1981, plaintiff filed an amended complaint in three counts. Count I was dismissed for reasons not pertinent to this appeal. Count II alleged that defendant Memorial had wrongfully em-

barked on a course of conduct directed toward the termination of the plaintiff's medical privileges there, and that the procedure employed violated the hospital bylaws, including those provisions concerning proper notice. Plaintiff sought injunctive relief under this count, requesting that the court declare Memorial's action in dismissing the plaintiff a nullity. Finally, count III sought money damages from Dr. Myers for his alleged wilful and wanton conduct in causing the wrongful termination of the plaintiff.

By written order of the court dated November 24, 1982, the court stayed count III against defendant Dr. Myers pending a determination of whether the plaintiff was improperly removed from the Memorial medical staff. The court then considered the issue under count II to be whether the hospital bylaws had been complied with or not, and, therefore, whether the plaintiff should be entitled to staff privileges.

During discovery in this lawsuit, it was disclosed that the plaintiff had been the subject of other suspensions at different New York hospitals. First, the plaintiff's admitting privileges at Good Samaritan Hospital in New York were suspended as of April 9, 1976; he described this suspension as resulting from "pressure from Southside," a sister facility. He was reinstated at Good Samaritan on May 12, 1976, but resigned from there on June 24, 1976. Second, the admitting privileges of the plaintiff at the State University Hospital of New York, Downstate Medical Center, were suspended on October 3, 1975, for "technical noncompliance with admitting regulations." Those privileges were reinstated on October 10, 1975, upon acceptance of the plaintiff's resignation as chief of otolaryngology there. Plaintiff believed this suspension resulted from his admission of patients who were not felt to meet the hospital's "emergency only" criteria. Plaintiff also resigned as part-time assistant professor at the university after he was advised he would not be recommended for tenure. Third, the New Brunswick Hospital terminated the plaintiff's privileges during the spring of 1976 when he failed to meet a residency requirement of living within 50 miles of the facility.

In addition, other circumstances surrounding his suspension at Southside were discovered. A letter was introduced disclosing that the plaintiff had been charged, during the term of his suspension following the death of the child, with mismanagement of some 10 other patient cases. Plaintiff had not related this fact to the committee during the hearing. The record also alludes to the fact that plaintiff was reinstated as the result of a negotiated settlement in which he agreed to resign.

Plaintiff in his deposition reiterated that he did not disclose the Southside suspension on his application based upon the advice of col-

leagues, and because "my heart told me this was the proper way to answer the question." He believed the action taken there was technically not a suspension, because it was later rescinded or "expunged." He felt that the other incidents of suspension were merely procedural in nature and thus of no consequence or relevance. Finally, he stated he believed that by relating his difficulties in New York to Dr. Rubenstein and others, the Springfield medical community and the hospital would become aware of his difficulties. As further support for his negative response, the plaintiff submitted numerous affidavits which variously stated that it was unnecessary for a physician in the plaintiff's situation to answer "yes" to the question on the application. Also, the plaintiff submitted an affidavit and letter from his attorney during the Southside matter. That attorney stated that, because the suspension at Southside was effectively withdrawn, and because it was "totally unsupportable" and "motivated by personal animosity of competing physicians," it should not be considered.

A motion for summary judgment was filed by Memorial on the grounds that the plaintiff had falsely answered his application for privileges. On May 28, 1985, the court found that the plaintiff had knowingly, intentionally, and falsely answered the question, and further found that revocation of his privileges was not in violation of Memorial's bylaws. The court granted summary judgment in favor of Memorial on count II and therefore also dismissed count III against Dr. Myers.

On June 27, 1985, plaintiff filed a motion for reconsideration, along with additional affidavits and documentation. The court, however, on September 9, 1985, affirmed its ruling of summary judgment. Plaintiff filed a notice of appeal on October 18, 1985, seeking reversal of the court order as it related to defendant Dr. Myers; by amendment to the notice of appeal filed October 21, 1985, the plaintiff also sought reversal of summary judgment entered in favor of defendant Memorial.

Initially, there exists some dispute as to what exactly is to be reviewed by this court. Plaintiff advocates that the defendant on appeal has changed its theory on why summary judgment was appropriate. The plaintiff maintains that the thrust of the defendant's argument below was that no material issue of fact existed because plaintiff had knowingly and intentionally lied on his application. In what plaintiff asserts is an almost imperceptible shift in theory, he contends the defendant now argues that the hospital's finding that he lied on the application cannot be reviewed by the courts. Plaintiff concludes that this issue was not presented before the trial court, and therefore cannot form the basis of a decision on appeal.

In point of fact, it is well established in Illinois that a private

hospital's refusal to appoint a physician to its medical staff is not subject to judicial review (*Jain v. Northwest Community Hospital* (1978), 67 Ill. App. 3d 420, 385 N.E.2d 108; *Mauer v. Highland Park Hospital Foundation* (1967), 90 Ill. App. 2d 409, 232 N.E.2d 776), the rationale being an unwillingness by the courts to substitute their judgment for that of private hospital authorities (*Knapp v. Palos Community Hospital* (1984), 125 Ill. App. 3d 244, 465 N.E.2d 554). The only exception to this rule of nonreview is when a physician's *existing* staff privileges are revoked or reduced; then a private hospital must follow its own bylaws or be subject to limited judicial review. (*Rao v. St. Elizabeth's Hospital* (1986), 140 Ill. App. 3d 442, 488 N.E.2d 685; *Jain v. Northwest Community Highland Park Hospital Foundation* (1978), 67 Ill. App. 3d 420, 385 N.E.2d 108.) Stated another way, a court should not act to annul expulsions from hospitals unless unfairness is demonstrated by the fact that the procedures followed violated the constitution or bylaws of the hospital. *Rao v. St. Elizabeth's Hospital* (1986), 140 Ill. App. 3d 442, 488 N.E.2d 685; *Maimon v. Sisters of the Third Order of St. Francis* (1983), 120 Ill. App. 3d 1090, 458 N.E.2d 1317.

■ Other courts have also recognized this limited scope of judicial review, determining it is for hospital authorities, charged with the responsibility of providing a competent staff of doctors, to evaluate such matters. (*Woodbury v. McKinnon* (5th Cir. 1971), 447 F.2d 839; *Sosa v. Board of Managers* (5th Cir. 1971), 437 F.2d 173.) Accordingly, exclusion from staff privileges done in accordance with hospital bylaws will only be reviewed and set aside if arbitrary, capricious, or unreasonable. (*Woodbury v. McKinnon* (5th Cir. 1971), 447 F.2d 839; *Bricker v. Sceva Speare Memorial Hospital* (1971), 111 N.H. 276, 281 A.2d 589.) As the court in *Sosa* stated:

"Human lives are at stake, and the [hospital] governing board must be given discretion in its selection so that it can have confidence in the competence and moral commitment of its staff. The evaluation of professional proficiency of doctors is best left to the specialized expertise of their peers, subject only to limited judicial surveillance. The court is charged with the narrow responsibility of assuring that the qualifications imposed by the Board are reasonably related to the operation of the hospital and fairly administered. In short, so long as staff selections are administered with fairness, geared by a rationale compatible with hospital responsibility, and unencumbered with irrelevant considerations, a court should not interfere." *Sosa v. Board of Managers* (5th Cir. 1971), 437 F.2d 173, 177.

Thus, absent some violation of hospital bylaws, it is clear that no

court may disturb the administrative decisions of a private hospital concerning suspension or revocation of staff privileges so long as such actions were fair and reasonable. Even then, judicial review is limited.

■■■ Summary judgment should be granted only when the pleadings, depositions, and admissions, together with any affidavits, show there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. (*Clifford-Jacobs Forging Co. v. Capital Engineering & Manufacturing Co.* (1982), 107 Ill. App. 3d 29, 33, 437 N.E.2d 22, 25; Ill. Rev. Stat. 1983, ch. 110, par. 2—1005.) The court is under a duty to construe the evidence strongly against the movant and liberally in favor of the opponent. (*Stringer v. Zacheis* (1982), 105 Ill. App. 3d 521, 522, 434 N.E.2d 50, 52.) If facts in the record lead to more than one conclusion or inference, including one unfavorable to the moving party, the motion should be denied. *Hansbrough v. Kosyak* (1986), 141 Ill. App. 3d 538, 547, 490 N.E.2d 181, 187.

Therefore, the precise inquiry before us now is whether the trial court properly found, from the record, that no genuine issue of material fact was raised as to any violation of the defendant hospital's bylaws when it revoked the plaintiff's privileges. Further, it must be determinable solely as a matter of law that the defendant's actions were not arbitrary or unreasonable, but were based upon what it considered to be patient mismanagement and a false response on this application. It follows, then, that we may only review this matter according to what the hospital considered in arriving at its decision: that the plaintiff had been suspended at Southside and had failed to disclose this fact on his application. The three other suspensions, which plaintiff argues involved admitting privileges, and thus were mere technical violations, only came to the defendant's attention during discovery after this lawsuit was filed. Thus, these suspensions are immaterial in reviewing the defendant's actions under its bylaws. Likewise, the plethora of documentation introduced by the plaintiff that other physicians would not have considered these other incidents reportable as suspensions or revocations of clinical privileges will not be considered.

According to the record, the plaintiff's privileges were summarily suspended upon a recommendation by the executive committee pursuant to article VII, section 2, of the hospital bylaws. Plaintiff was then afforded a hearing before an *ad hoc* committee of the medical staff as provided for under article VIII, section 1(c). The *ad hoc* committee decision was adverse to him, unanimously affirming the executive committee recommendation. Plaintiff was therefore entitled to, and received, review before the hospital's governing body pursuant to article

VIII, section 1(a), and article VIII, section 6. The decision of the governing body to revoke privileges after review then constituted a final determination by the hospital. Thus far, there is no indication that the hospital bylaws were violated.

In point of fact, the only objection plaintiff raises under the bylaws is a lack of adequate notice of the matters to be discussed during his discharge hearing. Concerning notice of a hearing, the hospital bylaws stated the following:

> "The notice of hearing shall state in concise language the acts or omissions with which the Practitioner is charged, a list of specific or representative charts being questioned, and/or the other reasons or subject matter that was considered in making the adverse recommendation or decision." Article VIII, section 3(b) (rev. 1978).

Plaintiff complains that during the February 11 hearing the question of his prior suspension and his response on the application were raised for the first time; the written notice sent to him only outlined the alleged mismanagement of certain patient cases. Plaintiff claims that, without prior notice, and without the benefit of representation by legal counsel, he still attempted to respond to this line of questioning.

It is undisputed that the notice of the *ad hoc* hearing specified certain patient cases to be reviewed without mentioning the application response. It is also undisputed that the application became an issue only toward the end of the February 11 hearing when a committee member raised the matter based upon a letter contained in the plaintiff's file. The hearing was recessed until February 13 to allow the plaintiff to adequately prepare his response to this new information. Still, no written notice regarding the application response was ever sent out to the plaintiff.

■ Nevertheless, we conclude that even without formal written notice, the defendant substantially complied with its own bylaws in that the plaintiff was sufficiently notified of the charge against him. There is no question but the original notice detailing instances of alleged patient mismanagement was entirely proper. The hearing was properly called and conducted; the subject of the plaintiff's alleged false response was only brought up in reviewing his file after a full discussion of the charges contained in the notice. Once this additional information was discovered during questioning, the committee decided to recess so that plaintiff could properly respond. Plaintiff was therefore apprised of the information to be considered during the February 13 hearing. Plaintiff was given sufficient time to prepare for that hearing, and he could have brought in any additional information he de-

sired. He also could have had legal counsel with him if he wished. Displeased with his suspension, the plaintiff should not now be heard to say that he was prejudiced by an alleged lack of notice. We make one more observation: article VIII, section 3(b), of the hospital bylaws, quoted above, does not specifically require formal *written* notice in all instances.

We also note that the plaintiff was in fact afforded a greater opportunity to adequately respond to the additional matter than was the physician in *Rao v. St. Elizabeth's Hospital* (1986), 140 Ill. App. 3d 442, 488 N.E.2d 685. An *ad hoc* committee in *Rao* began to question the physician concerning certain patient cases that had not been specifically identified in the notice of hearing. However, the committee also offered the plaintiff, on numerous occasions, the chance to postpone the hearing until he was able to adequately review those charts. In all instances, plaintiff responded, "I'm at your disposition," and never requested postponement. The committee then voted to discuss these new charts and notes. The plaintiff was later suspended. He filed suit, contending he was unable to appropriately respond to the committee inquiries due to lack of adequate notice under the hospital bylaws.

The appellate court in *Rao* considered a notice of hearing provision identical to the one here at issue. The court then held that the trial court did not abuse its discretion in finding that the plaintiff had acquiesced in the decision of the committee to proceed with the hearing as convened. The court further found that the committee believed the plaintiff was agreeable to proceeding with the hearing, and acted accordingly. In the instant matter, on the other hand, there was more notice of the additional charges as well as a greater occasion to adequately respond to the charges than was present in *Rao*.

The plaintiff next contends that summary judgment could not be properly granted in any event because his state of mind in answering the question on the application was directly in issue. Plaintiff points to the finding of the trial court in granting summary judgment that he knowingly, intentionally, and falsely answered the question on the application. Plaintiff argues that the trial court not only found the answer to be false, but that his state of mind in doing so was such that he knew he was falsely responding, and intentionally did so. Continuing, plaintiff maintains that such "state of mind" determinations are clearly within the province of the jury. Therefore, the trial court erred in not allowing the matter to proceed to a jury. As plaintiff notes, several decisions have held that summary judgment is particularly inappropriate where the parties seek to draw inferences on questions of intent, motive, or subjective feelings and reactions. (*Schuster v. East St. Louis*

*Jockey Club, Inc.* (1976), 37 Ill. App. 3d 483, 345 N.E.2d 168; *Lundin v. Egyptian Construction Co.* (1975), 29 Ill. App. 3d 1060, 331 N.E.2d 208; *State National Bank v. Kewanee National Bank* (1973), 16 Ill. App. 3d 272, 305 N.E.2d 732.) However, we find that the plaintiff's alleged state of mind in answering the question concerning prior suspensions is irrelevant.

The following language is contained at the end of the plaintiff's application for privileges, under which the plaintiff also signed his name: "I fully understand that any significant misstatements and/or admissions from this application constitute cause for summary dismissal from the staff." The application form also provided that, if a "yes" answer is given to certain inquiries, the applicant may fully explain the details on a separate sheet of paper. Had the plaintiff wished to explain what he felt was a baseless suspension, later withdrawn and rescinded, he could easily have done so. His so-called "difficulty" in New York was a suspension of clinical privileges, regardless of whether he was considered an associate or temporary staff member. Failure to respond affirmatively to a question seeking disclosure of prior suspensions could be construed as a false representation irrespective of the plaintiff's claims that he answered in good faith, sought advice on how to respond, and honestly believed he was filling out the application in an appropriate manner.

Furthermore, article V, section 1, of the hospital bylaws states:

"All applications for appointment *** shall include information as to whether the applicant's membership status and/or clinical privileges have ever been revoked, suspended, reduced or not renewed at any other hospital or institution ***."

Thus, the language of the bylaws is clear: all applications shall disclose any previous reduction or suspension of clinical privileges. Taking the bylaws in conjunction with the language in the application, the defendant was within its rights in terminating staff privileges for what it considered to be a material misrepresentation.

A hospital is charged with the care of its patients. As such, it has a prevailing interest in insuring that its medical staff provides competent patient care. Hospital authorities, concerned with human health, may demand full disclosure of information reasonably relevant to the goal of patient care. Such disclosure may be critical to a truly well-informed decision of whether or not to grant staff privileges. The fact that others had allegedly counseled the plaintiff does not relieve him of the responsibility for his own actions in failing to disclose a prior suspension. In any event, we note the committee determination affirming the revocation of the plaintiff's privileges stated as its basis both the false

answer and instances of inappropriate patient care. In addition, false answers on applications for employment have repeatedly been considered proper grounds for dismissal in various other contexts. *Munoz v. Civil Service Com.* (1975), 32 Ill. App. 3d 1052, 337 N.E.2d 344; *Roundtree v. Board of Review* (1972), 4 Ill. App. 3d 695, 281 N.E.2d 360; *Price v. Civil Service Board* (1970), 123 Ill. App. 2d 2, 259 N.E.2d 613.

The trial court's use of "knowingly" and "intentionally" in its order granting summary judgment in no way alters our decision. A reviewing court will affirm the judgment, order, or decree of a trial court if it is justified in the law for any reason appearing in the record irrespective of the particular grounds advanced by the trial judge. We therefore hold that summary judgment was properly granted, as the defendant hospital did not violate its own bylaws or act capriciously or unreasonably.

Nevertheless, plaintiff asserts that certain partners in the Springfield Clinic had "full knowledge" of the "true facts" of his prior difficulties. These physicians were also members of the credentials committee at Memorial, which reviews applications and makes recommendations to the executive committee. The plaintiff also claims that his difficulties were common knowledge within the Springfield medical community. From these two facts, he concludes that constructive knowledge of his suspensions in New York must be imputed to the hospital. Accordingly, the defendant's failure to act upon that knowledge before the revocation hearing amounted to waiver.

However, waiver may only be found if there is knowledge of the existence of a right and an intent to relinquish it. (*Northern Trust Co. v. Oxford Speaker Co.* (1982), 109 Ill. App. 3d 433, 440 N.E.2d 968.) There is no evidence that the hospital ever knew or considered the fact of the plaintiff's previous suspension, let alone intentionally relinquished any right to act upon it. Plaintiff's varied assertions that the alleged knowledge of members of the Springfield Clinic who also served on committees at Memorial should be imputed to defendant are similarly unfounded.

Moreover, it is highly doubtful and extremely speculative that those physicians had "full knowledge," as plaintiff asserts. One physician, Dr. Choi, apparently had some prior knowledge of the suspension, and he wrote a letter so indicating. However, he later stated the full extent of his knowledge concerned something he had heard about a complication from a tonsillectomy in New York. He believed it was "just rumor, not true background." Another partner in the Clinic and member of the credentials committee at Memorial, Dr. Wabner, subsequently de-

nied any knowledge of the suspension during his deposition. During their depositions, all other members of the credentials committee, including Dr. Mansen, another partner at the Springfield Clinic, similarly denied knowledge of any suspensions. However, these doctors also stated that such information is absolutely necessary to determine whether or not to approve an application.

Plaintiff further maintains that Dr. John Allen, another member of the Clinic, is an *ex officio* representative on the executive committee by virtue of his immediate past presidency of the staff of Memorial. Plaintiff also urges that the defendant should have been aware of his prior suspension through Dr. Allen. Without commenting on whether Dr. Allen even had such knowledge, we note that article XI of the bylaws, which sets out the composition of the executive committee, does not provide that past medical staff presidents be granted *ex officio* status on that committee.

In sum, the plaintiff has not presented anything which even infers that the defendant waived its right to rely on the correctness of the answers in the application and to proceed accordingly when a misstatement was discovered. The application and the bylaws specifically require disclosure of any previous suspensions. The plaintiff cannot escape this responsibility by making nebulous assertions that because he told some other physicians about his difficulties, then the Springfield medical community in general, and the defendant in particular, also had full knowledge.

Finally, a motion to dismiss the appeal on behalf of the defendant Dr. Myers was taken with this case. Dr. Myers asserts that because the brief of the plaintiff fails to raise any argument as to the trial court's order granting summary judgment on count III relating to him, the appeal of that portion of the order has been waived. The defendant relies on Supreme Court Rule 341(e)(7) which states in relevant part: "Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." 103 Ill. 2d R. 341(e)(7).

Because we are affirming the order entering summary judgment in this matter, we need not address any issue raised by the defendant Dr. Myers' motion.

Based on the foregoing reasoning, we affirm the entry of summary judgment by the circuit court of Sangamon County.

Affirmed.

GREEN and SPITZ, JJ., concur.