GEORGE J. MURGES *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. JOHN T. BOWMAN *et al.*, Defendants-Appellants and Cross-Appellees.

First District (2nd Division)· No. 1—93—4318

Opinion filed June 30, 1995.—Rehearing denied September 29, 1995.

154

David A. Novoselsky & Associates, of Chicago (David A. Novoselsky and Kevin S. Besetzny, of counsel), for appellants.

Johnson & Bell, Ltd., of Chicago (Michael P. Siavelis and David M. Macksey, of counsel), for appellees.

JUSTICE McCORMICK delivered the opinion of the court:

Defendants John T. Bowman and Lane Allan Corday appeal from a preliminary injunction entered against them in this lawsuit, which arose out of the breakup of the law firm of Murges, Bowman & Corday (MBC) (now known as plaintiff, George J. Murges and Associates, Ltd.). We affirm.

Defendants removed client files from MBC's offices when they quit the firm in December 1991. In February 1992, the trial court imposed a temporary restraining order (TRO), which required defendants to deposit all fees earned on the disputed files into an escrow account. On July 23, 1992, the court appointed a receiver to administer the escrow and modified the TRO to permit distribution of some of the fees. The trial court also indicated that it would enter a preliminary injunction delineating the responsibilities of the receiver. Before it could do so, defendants appealed, and we affirmed the modification of the TRO and the appointment of the receiver. (*Murges v. Bowman* (1993), 254 Ill. App. 3d 1071, 627 N.E.2d 330 (*Murges I*).) After our mandate issued, the trial court entered the preliminary injunction spelling out the duties of the receiver and, again, modifying the terms of the escrow. Defendants have filed another interlocutory appeal. Plaintiffs have cross-appealed.

From 1984 until 1992, plaintiff George J. Murges and defendants worked together as MBC, a professional corporation of which Murges was the owner. MBC specialized in workers' compensation claims and practiced primarily before the Illinois Industrial Commission. On December 30, 1988, Murges suffered a stroke. Murges returned to work part-time in the fall of 1989. Defendants handled almost all of MBC's work during Murges' absence and after his return. By late 1991, defendants became dissatisfied with their situation at MBC and told Murges that they wanted to buy MBC from him. However, no agreement on a purchase price could be reached.

On December 30, 1991, defendants decided to leave MBC. They did not tell Murges, who left for a Florida vacation on January 3, 1992. During Murges' absence, defendants made arrangements to set up a new firm and they prepared a form letter to send to clients of MBC informing the clients of the dissolution of the firm.

On January 18, 1992, Bowman called Murges in Florida and informed him that defendants had resigned as officers, directors, and employees of MBC. They left letters of resignation on Murges' desk. On the following Saturday, defendants took the files of all 660 MBC clients to their new offices. The new firm sent letters to all 660 clients requesting a designation of attorney. Most of the clients signed the forms designating defendants as their attorneys. On January 20, 1992, Murges returned to MBC's now empty offices.

On January 23, 1992, Murges and MBC filed a complaint seeking an injunction directing defendants to return the files and precluding defendants from soliciting MBC's clients. Murges and MBC also sought recovery of legal fees earned for work on the files and tort damages for conversion, tortious interference with business relationships, and breach of fiduciary duty. At defendants' request, Murges changed the name of MBC to George J. Murges and Associates, Ltd., which substituted as co-plaintiff.

Following a contested hearing the trial court entered a TRO, ordering defendants to deposit, in a special bank account, all settlement amounts and awards received for work on files taken from MBC's offices. Only client awards, costs, and attorney referral fees were to be distributed from the account. No one was entitled to withdraw attorney fees.

On February 10, 1992, the court modified the TRO pursuant to an agreement between the parties. Under the agreement, defendants retained the files of MBC's former clients who had sent letters designating defendants as their new attorneys. There were more than 400 such files. Defendants delivered to Murges all remaining files, but Murges agreed not to solicit the clients who had made no designation of attorney in response to defendants' letter. By order dated June 24, 1992, the court again modified the TRO to permit defendants and plaintiffs each to withdraw 25% of the special fund, while the fund retained the remaining 50%. The court also directed the parties to distribute future receipts in the same proportion.

The trial court held a hearing on the request for a preliminary injunction on May 19, 1992. At that time, the parties stipulated that MBC was a corporation properly registered with the Secretary of State; that Murges was designated as president of the corporation; that Bowman was secretary; and that Corday was treasurer. The parties further stipulated that Murges owned 100% of the outstanding stock. However, Murges later admitted during his testimony that no MBC stock had ever been issued. Murges also admitted that he had presented defendants to clients as his "partners."

On July 23, 1992, the trial court issued its findings in a "Memorandum of Opinion." The trial court found that MBC was formally a professional corporation in which the parties conducted themselves, to some extent, as partners. The court found that defendants had breached their fiduciary duties to the corporation by removing the client files when they left MBC and by sending notices to the clients (including the designation of representation forms) regarding their withdrawal from the firm and the firm's dissolution. The court appointed a receiver to administer the previously established escrow ac-

count. The court enjoined the distribution of any funds from the escrow because it concluded that "based on Defendants' past [, *i.e.*, fraudulent] conduct, *** [this court] cannot assure itself that the monies collected from the settlements or awards of removed files will be properly accounted for." The court further found that "the income from [the stolen files] is likely to be in imminent danger of dissipation if a receiver is not appointed to preserve the status quo."

The trial court continued the matter until August 4, 1992, at which time it was to have entered a formal order for preliminary injunction delineating the responsibilities and duties of the receiver. On July 28, 1992, the court entered an additional order clarifying that its order of July 23 was intended to halt any distribution of funds from the escrow, other than those due the clients. The court also issued an additional order *nunc pro tunc* July 17, 1992, entering judgment in favor of defendants on plaintiffs' request that defendants be enjoined from maintaining possession of the files in their possession, as well as regarding plaintiffs' request that defendants be enjoined from keeping clients and generating fees from clients referred to them by firms or individuals who had formerly referred clients to MBC.

Defendants appealed the July 23 order. Plaintiffs attempted no appeal of the July 28 order. In an order entered on September 13, 1993, while *Murges I* was pending before this court, the trial court denied defendants' motion to dismiss plaintiffs' second amended complaint. Defendants had urged that plaintiffs' failure to appeal the July 28 order had rendered that order *res judicata* of plaintiffs' claims on the merits. The trial court stated that the July 28 order had been for purposes of the preliminary injunction only and not on the merits.

On October 12, 1993, this court issued *Murges I*. We held that we had jurisdiction only to review the appointment of the receiver and the modification and refusal to dissolve the TRO. We concluded that the trial court did not abuse its discretion in modifying and refusing to dissolve the TRO and affirmed the appointment of a receiver *pendente lite*. In affirming the trial court's decisions regarding the TRO, we held that plaintiffs had demonstrated an ascertainable right; that they would suffer irreparable injury absent injunctive relief; they had no adequate remedy at law; and they had shown a likelihood of success on the merits.

Six weeks later, on November 22, 1993, without hearing new evidence, the trial court entered its order of preliminary injunction, incorporating the findings it had made in July 1992. However, the trial court also modified the terms of the escrow. The court found the need for a constructive trust to be still present. The court found,

however, that defendants might be entitled to some of the fees in the escrow and that to deny them any compensation might "inhibit the enthusiastic representation by Defendants of clients previously associated with the Murges firm and be potentially prejudicial to the clients' interest." The court directed the receiver to disburse one-third of the escrow to defendants; disburse one-third to plaintiffs; and retain the remainder in escrow for resolution of the controversy on the merits. The court stated that "[i]n all other respects, the terms of this court's Memorandum of Opinion of July 23, 1992 are incorporated in this Order of Preliminary Injunction where the former is not inconsistent with the latter." These appeals followed.

■ As in *Murges I*, defendants assail the trial court's denial of their request for a change of venue based on the court's prejudgment of the case. In *Murges I*, we did not address this issue because review under Supreme Court Rule 307(a)(1) (134 Ill. 2d R. 307(a)(1)) is limited, and we lacked jurisdiction "to review findings of fact which do not affect the specific remedies for which the appeal is allowed." (*Murges I*, 254 Ill. App. 3d at 1081.) The same rationale applies now. We lack jurisdiction to review the court's denial of the motion to change venue.

■ Defendants next contend that when the trial court entered the July 28 order denying plaintiffs' request that defendants return client files and plaintiffs failed to appeal, the trial court's ruling became the law of the case and was on the merits. Thus, defendants argue, all that remained was a cause of action for damages and the trial court's imposition of injunctive relief was inappropriate.

The trial court stressed in numerous orders, subsequent to the July 28 order, that the question of possession of the files had not been resolved on the merits and that the July 28 order was regarding injunctive relief only. For example, in its September 13, 1993, "Memorandum of Opinion" denying defendants' motion to dismiss the second amended complaint on the ground that the July 28 order had become a judgment on the merits regarding return of the files, the court stated: "It cannot be seriously argued that this court directed a verdict *on the merits* of the case against plaintiffs at a preliminary injunction hearing" in light of the language in the "Memorandum of Opinion." (Emphasis added.) Thus, to the extent that the July 28 order is unclear, the trial court has stated it was an order denying injunctive relief only. Indeed, under Illinois law, a preliminary injunction hearing is not one on the merits. *Rao v. St. Elizabeth Hospital of the Hospital Sisters of the Third Order of St. Francis* (1986), 140 Ill. App. 3d 442, 461, 488 N.E.2d 685.

Defendants belabor this point; however, their argument is based on statements made in trial transcripts which are not a part of the

record on appeal. Therefore, we cannot examine those statements, and any further argument on this matter is waived under Supreme Court 341(e)(7). (134 Ill. 2d R. 341(e)(7).) Moreover, in essence, defendants are asserting that plaintiffs have an adequate remedy for damages. In *Murges I*, we stressed that defendants had not argued that Murges had an adequate remedy at law or that his harm was not irreparable. Defendants will not be heard to do so now. *Battaglia v. Battaglia* (1992), 231 Ill. App. 3d 607, 596 N.E.2d 712.

Defendants also seek to challenge the trial court's imposition of the preliminary injunction. On review of the issuance of a preliminary injunction, "the sole issue is whether the trial court abused its discretion. [Citation.] If the trial court had a legal basis for granting the injunction, no abuse of the trial court's discretion will be found. [Citation.] Whether to issue a preliminary injunction is within the sound discretion of the trial court upon a *prima facie* showing of necessity." (*Harper v. Missouri Pacific R.R. Co.* (1994), 264 Ill. App. 3d 238, 249, 636 N.E.2d 1192.) A *prima facie* showing of necessity is established when the party seeking the injunction shows (1) he has a clearly ascertainable right which is in need of protection; (2) he will suffer irreparable injury in the absence of an injunction; (3) he has no adequate remedy at law; and (4) he is likely to be successful on the merits. *Harper*, 264 Ill. App. 3d at 249.

These are the same factors necessary to obtain a TRO and which we found to have been established in *Murges I*. Indeed, our supreme court has held that a TRO and a preliminary injunction are the same type of relief, requiring a showing of the same factors. (*Kable Printing Co. v. Mount Morris Bookbinders Union Local 65-B Graphic Arts International Union* (1976), 63 Ill. 2d 514, 524, 349 N.E.2d 36; see also *Tierney v. Village of Schaumburg* (1989), 182 Ill. App. 3d 1055, 1059-60, 538 N.E.2d 904 (cited in *Murges I*).) By the time *Murges I* was before this court, the preliminary injunction hearing had been held. The trial court received no additional evidence after *Murges I*, and, indeed, the preliminary injunction issued and the case returned to this court within six weeks. Certainly, our view of the facts is unchanged. Nonetheless, defendants raise myriad issues regarding findings we have already reviewed.

■ For instance, in *Murges I*, we held that regardless of whether MBC was a corporation or a partnership, defendants owed fiduciary duties to Murges. Nonetheless, defendants now contend that Murges did not seek relief on behalf of a partnership. Rather, he sought relief solely to protect his corporate interest. Thus, according to defendants, because Murges did not secure certification for MBC to practice law as a corporation pursuant to Supreme Court Rule 721

(134 Ill. 2d R. 721) prior to the institution of this litigation and he held defendants out as his partners in violation of Rule 7.5(d) of the Illinois Rules of Professional Conduct (134 Ill. 2d R. 7.5(d)), he has no clear and ascertainable right to seek injunctive relief on behalf of the corporation.

Defendants have obfuscated the issue decided by this court in *Murges I* in order to evade our holding there. The trial court found that Murges was the president and sole owner of MBC, a professional corporation. The court further found that defendants were employees and officers of the corporation. Of these facts, there is no room for doubt. Defendants seek to raise potential ethical and rules violations by Murges and MBC to convince this court to ignore the fact that defendants knew they were corporate employees of MBC. It may well be that Murges and MBC violated some rules and it may well be that Murges wrongfully called defendants his partners, even to clients. However, the manner in which clients viewed MBC is not at issue here. Rather, the issue before this court is the fiduciary duties defendants knowingly took on when they associated themselves with MBC. Indeed, the record shows that MBC was not a partnership. Defendants acknowledged that they had no partnership agreement with Murges. Furthermore, MBC was registered as a corporation with the Secretary of State. MBC paid taxes as a corporation and MBC paid the expenses and salaries of defendants. Accordingly, the trial court's finding that Murges has an ascertainable right was not an abuse of discretion.

■ Citing *Bowman v. Dixon Theater Renovation, Inc.* (1991), 221 Ill. App. 3d 35, 581 N.E.2d 804, defendants further contend that the escrow in this case is an unlawful equitable attachment. Defendants' reliance on *Bowman* is misplaced. Here, the trial court made numerous findings prior to establishing the escrow, the controlling two of which were its conclusions that (1) "based on Defendants' past [, *i.e.*, fraudulent] conduct, *** [this court] cannot assure itself that the monies collected from the settlements or awards of removed files will be properly accounted for," and (2) that "the income from [the stolen files] is likely to be in imminent danger of dissipation if a receiver is not appointed to preserve the status quo." Under Illinois law, when a trial court makes such findings, the imposition of a constructive trust like the one here is not an abuse of discretion. (See *Bowman*, 221 Ill. App. 3d at 42-43 (recognizing that Illinois law permits equitable relief where a fund of money is at issue if "the judgment for money damages would be worthless due to the insolvency of the judgment debtor").) Furthermore, the imposition of a constructive trust is appropriate in cases of breach of fiduciary duty. (*Veco Corp. v. Babcock*

(1993), 243 Ill. App. 3d 153, 165, 611 N.E.2d 1054.) Finally, *Bowman* recognized that trial courts may attach property in cases in which the plaintiff has a cognizable interest in the specific property allegedly attached. (*Bowman*, 221 Ill. App. 3d at 40-41; see also *Kurti v. Silk Plants Etc. Franchise Systems, Inc.* (1990), 200 Ill. App. 3d 605, 609-11, 558 N.E.2d 361.) During oral argument of this appeal, defendants conceded that plaintiffs possess such an interest. Accordingly, the escrow account is not an unlawful equitable attachment.

■ Defendants also argue that the trial court abused its discretion because its decision to award an injunction was based solely on its desire to punish defendants. As we have noted, the trial court made findings that the fees at issue were in danger of dissipation. This finding alone supports the trial court's decision. To the extent that the court desired to send a message to Illinois attorneys that the behavior exhibited by defendants would not be countenanced, we are unaware of any authority holding that such a statement is improper or amounts to reversible error. Defendants cite *In re General Order of March 15, 1993* (1994), 258 Ill. App. 3d 13, 629 N.E.2d 673, in which the court held unconstitutional a legislative enactment that essentially authorized circuit courts to regulate the practice of law. This case is far different from *In re General Order of March 15*. To the extent that the trial court "punished" defendants, it did not do so to them in their capacity as "attorneys" but rather in their capacity as litigants before the court. The fact that the trial court saw fit to send an additional message of warning to Illinois attorneys along with its injunction order is of little consequence where, as here, the injunction is supported by the requisite proof.

■ Relying on *Jacob v. Norris, MacLaughlin & Marcus* (1992), 128 N.J. 10, 607 A.2d 142, defendants further assert that they acted properly in leaving MBC and, therefore, no basis for injunctive relief existed. The *Jacob* case is inapposite. In *Jacob*, the court interpreted Rule 5.6 of the New Jersey Model Rules of Professional Conduct, which defendants note is identical in text to Rule 5.6 of the Illinois Rules of Professional Conduct (134 Ill. 2d R. 5.6). The defendant law firm, a professional corporation like MBC, maintained termination compensation agreements with its attorney shareholders which discouraged lawyers from retaining clients of the firm after the lawyers left the firm. The court held that such agreements conflicted with Rule 5.6's prohibition against agreements which restrict a lawyer's right to practice after termination. *Jacob*, 128 N.J. at 17, 607 A.2d at 146.

Defendants acknowledge that no such agreement existed here. Thus, Rule 5.6 is inapposite. Nonetheless, defendants contend that

the trial court's action, in effect, imposed such an agreement. We disagree. The trial court in no way restricted defendants' right to practice law. Much of defendants' argument is based on the hypothetical that were the same opportunity to leave a firm to present itself to them in the future, they would be prevented from leaving the firm in the manner they left MBC. We decline to address this bizarre hypothetical. Furthermore, the trial court did not find that defendants had no right to leave MBC. Rather, the trial court found that the manner in which defendants left MBC constituted a breach of fiduciary duty, was fraudulent, was "not evenhanded," "created an illusory urgency" that clients needed to make an immediate designation of attorney, was intended to conceal their actions from MBC, was accomplished "by stealth," and so on. These findings are amply supported by the record.

As the trial court further noted, defendants could have forestalled these proceedings by announcing their intention to leave and seeking a declaratory judgment prior to raiding MBC's files and assets. For defendants to come before this court and claim that they left MBC in an appropriate fashion, out of selfless concern for their clients, particularly in light of *Murges I,* is astonishing, and we reject their contention.

■ Defendants also urge that to permit plaintiffs to prevail here violates the holding in *Corti v. Fleischer* (1981), 93 Ill. App. 3d 517, 417 N.E.2d 764, that the client retains the ultimate decision as to who will be his attorney, agreements among attorneys to the contrary notwithstanding. The trial court's decision and this court's decision in *Murges I* do not do violence to this principle. The trial court has permitted defendants to retain the files of the clients who designated them as their attorneys. The trial court's imposition of injunction in this case is heavily premised on its finding that the manner in which defendants solicited their clients was underhanded. However, the court did not restrict the movement of clients from one attorney to another. Furthermore, the trial court's modification of the TRO permits defendants access to some of the fees generated by the contested clients. The trial court's action did not run afoul of *Corti.*

■ Defendants' final contention is that the order of preliminary injunction in this case, by disbursing one-third of the escrow to defendants and one-third to plaintiffs, constitutes unlawful fee-splitting, and thus also violates the mandate of *Corti.* Defendants' argument is wide of the mark. First, this case involves no contractual fee-splitting agreement. Thus, by its terms, *Corti* does not apply, as it pertained solely to the validity of contracts which required the shar-

ing of fees among lawyers, one of whom had no attorney-client relationship with the client. *O'Hara v. Ahlgren, Blumenfeld & Kempster* (1989), 127 Ill. 2d 333, 537 N.E.2d 730, cited by defendants, is likewise inapposite because it addressed the validity of a sharing of legal fees arrangement between a lawyer and a nonlawyer. Furthermore, as this court noted in *Phillips v. Joyce* (1988), 169 Ill. App. 3d 520, 532, 523 N.E.2d 933, fee-sharing arrangements between attorneys who actually represent a client are not *per se* violative of the Code of Professional Responsibility (107 Ill. 2d R. 2—107).

In *Saltzberg v. Fishman* (1984), 123 Ill. App. 3d 447, 462 N.E.2d 901, the defendant took client files when he was terminated from the plaintiff's law firm. The parties entered into a consent decree which specified that defendant was to disburse to the firm the fees for clients whom he had not brought to the firm. This court affirmed the settlement, noting that all the client files belonged to the firm because employment of one member of a firm is employment of the entire firm. (*Saltzberg*, 123 Ill. App. 3d at 454.) Thus, requiring the defendant to disgorge fees did not amount to an illegal fee-splitting arrangement because the decree "simply perpetuat[ed] defendant's employment with the firm for the limited purpose of disposing of cases [that belonged to the firm]." *Saltzberg*, 123 Ill. App. 3d at 454-55.

In this case, the parties entered into no agreement at all, let alone one providing for the unlawful splitting of fees as addressed in *Corti* and *O'Hara*. The trial court's imposition of an injunction in which fees generated by the work of defendants are shared with plaintiffs does not create such an agreement, and the trial court's action is no different in effect from the arrangement approved in *Saltzberg*.

■ In their cross-appeal, plaintiffs contend that the trial court had no basis upon which to modify the conditions of the escrow, from one which required that all fees on the disputed files be held, to one in which one-third of the fees were disbursed to each party with the remaining constituting a damage pool. Plaintiffs contend that the trial court abused its discretion in making this change because no evidentiary hearing had been held; defendants failed to show a change in circumstances; and the trial court erroneously relied on defendants' "incessant argument" that *Corti* required modification.

In modifying the conditions of the escrow, the trial court stated:
> "[T]he court believes that Defendants may very well be entitled to *some* part of the fees that have been escrowed as a result of their representation and successful disposition of the workers['] compensation cases since the break up of their relationship with

Plaintiff regardless of possible damages that may be ultimately imposed against them, should that occur.

It would be unreasonable for this Court to prevent Defendants from being compensated any amount for their ongoing representation of the dispute clients and still expect them to represent the workers['] compensation clients. Denying them *any* compensation would prejudice their enthusiastic representation of workers['] compensation claims to the detriment of the clients. This would serve no useful purpose." (Emphasis added.)

A trial court may modify a TRO "when conditions have changed which are of sufficient importance to warrant a modification." (*Northwestern Steel & Wire Co. v. Industrial Comm'n* (1993), 254 Ill. App. 3d 472, 476, 627 N.E.2d 71.) Here, the trial court, having weighed the equities, was concerned about the welfare of the clients, given that the money in the escrow might be tied up for several more years. We consider even the potential diminution in the quality of representation of the clients to be a change of sufficient importance to warrant the trial court's action.

Affirmed.

SCARIANO, P.J., and HARTMAN, J., concur.